**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

MANBRO ENERGY CORPORATION,

               Plaintiff,

   -against-

CHATTERJEE ADVISORS, LLC,
CHATTERJEE FUND MANAGEMENT, LP,
CHATTERJEE MANAGEMENT
COMPANY, d/b/a THE CHATTERJEE
GROUP, and PURNENDU CHATTERJEE,

           Defendants.

---

**20 Civ. 3773 (LGS)**

**SECOND AMENDED**
**COMPLAINT AND JURY DEMAND**

Plaintiff Manbro Energy Corporation ("Manbro" or "Plaintiff") brings the following Second Amended Complaint (the "Complaint") against Defendants Chatterjee Advisors, LLC ("Chatterjee Advisors" or "the Fund Manager"), Chatterjee Fund Management, LP ("Chatterjee Fund Management"), Chatterjee Management Company ("CMC"), d/b/a The Chatterjee Group ("TCG"), and Purnendu Chatterjee ("Chatterjee") (together, the "Defendants") for breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with contract, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and unjust enrichment. The allegations in this Complaint are based on Plaintiff's personal knowledge with regard to itself and based on information and belief, including the investigation of counsel and the review of publicly available information, as to all other matters.

## NATURE OF THE ACTION

1.      This action seeks redress for an unlawful "final distribution" to members of Winston Partners Private Equity, LLC ("WPPE" or the "Fund"), which has resulted in substantial damages to Plaintiff. At the time of the final distribution in 2017, WPPE's only significant investment was in Haldia Petrochemicals Limited ("HPL"), an Indian petrochemicals company controlled by Chatterjee. Defendants leveraged their familiarity with HPL to benefit themselves at the expense of the Fund's investors by cashing out investors at below-market value while keeping the HPL shares for themselves. In 2018, while accepting the Serar Sera Bangali Award given to prominent Bengali personalities, Chatterjee said, "As a fiduciary, I have to do the right thing."[1] In this case, however, Chatterjee did not.

---

[1] ABP News, *Dr. PC Sera Bangla Award 2018 Ceremony Video with English Captions*, YouTube (Aug. 18, 2018), https://www.youtube.com/watch?v=yh_9ZN_YsQM; TT Bureau, *The 14th Edition of ABP Ananda Sera Bangali Celebrated Nine Achievers on a Starry Evening*, The Telegraph Online (Aug. 15, 2018, 12:00 AM), https://www.telegraphindia.com/entertainment/the-14th-edition-of-abp-ananda-sera-bangali-celebrated-nine-achievers-on-a-starry-evening/cid/1310251.

2.       In 2017, following several years of reduced earnings and restructurings, HPL had reached a turning point, its value had substantially increased, and it was poised for further significant growth.  Rather than maximizing value for WPPE investors, including Plaintiff who had been invested in the Fund for nearly 20 years, Defendants saw an opportunity to capture the full upside of this long-term investment for themselves.  Defendants orchestrated a scheme to make a final distribution to members of the Fund at an artificially depressed Net Asset Value ("NAV") based upon a non-compliant accounting practice that did not reflect fair market value – a practice that had been flagged as improper by the Fund's external auditors five years prior – while retaining the underlying HPL shares for themselves.

3.       Defendants' purported redemption price was based on the NAV of the HPL shares of ten Indian rupees ("INR") per share, or roughly 15 cents (U.S.), representing the cost of the Fund's investment in the HPL shares in the 1990s, which does not reflect the fair market value of those shares in 2017.  For example, in fiscal year 2017, HPL's earnings before interest, taxes, depreciation and amortization ("EBITDA") were approximately INR 36,879.16 million, or approximately U.S. $570 million, its "highest ever" to that date.  This was an investment that had appreciated significantly since the initial investment two decades earlier.  In fact, applying any reasonable multiple to that amount of EBITDA would result in a per-share value of HPL that is orders of magnitude higher than ten INR per share.  Defendants were thereby substantially and unjustly enriched at the direct expense of Plaintiff (and other members of the Fund) through Defendants converting the shares for themselves at an artificially depressed value.  Defendants' self-dealing was in breach of the governing contract, the implied covenant of good faith and fair dealing, the fiduciary duties Defendants owed the Fund's investors, and equity and good conscience, and entitles Plaintiff to damages.

4.      The Fund was formed as a Delaware limited liability company in 1998 and is governed by the Limited Liability Company Agreement of Winston Partners Private Equity LLC, dated December 13, 1998 (the "LLC Agreement"), attached hereto as Exhibit A.  Pursuant to the LLC Agreement, Chatterjee Advisors was designated as Fund Manager of the Fund.  In addition, the other Defendants substantially participated in the management of the Fund, including communicating with members and making investment decisions on behalf of the Fund.

5.      The purpose of the Fund was for Chatterjee Advisors to use members' capital to make "private equity"-style investments, which by their nature are illiquid and require time to realize value.  For that reason, the LLC Agreement imposed restrictions on members' ability to withdraw from the Fund before the Fund's investments could be liquidated.  In return for locking up members' capital, Chatterjee Advisors promised – indeed, represented that its "principal investment objective" was – "to dispose of [the Fund's] existing investment positions in an orderly manner that is intended to maximize long-term values for both former and continuing members."

6.      In May 2017, nearly two decades after the Fund was formed, Defendants announced that they were in the process of dissolving the Fund and were making a "final distribution" to the Fund's members at NAV as of March 31, 2017.  Although U.S. GAAP requires that private equity funds calculate NAV based on the fair market value of their portfolio investments, Defendants had calculated NAV on a "cost less impairment" basis, i.e., at the *lower* of the investment cost basis or fair market value.  Defendants were well aware that this practice was not in compliance with applicable accounting rules – particularly for investments, such as those held by the Fund, whose fair market value *exceeded* investment cost.  The Fund's external auditor had issued an "adverse opinion" and refused to sign off on the Fund's financial

statements for that very reason in 2012, and the Fund's accounts had not been audited in the ensuing years.

7.     When asked by Plaintiff why the Fund did not seek to address the auditor's adverse opinion, Defendants did not deny that the Fund's NAV reflected on its books failed to reflect fair market value, but instead insisted that it did not matter because Defendants were no longer taking a management fee as a percentage of such NAV (because the Fund was static for years with virtually no action by Defendants to liquidate investments and return the proceeds to investors).  Of course, the fact that NAV was well below fair market value *did* matter when Defendants later improperly purported to cash out investors based on such below-market NAV.

8.     At the time of the final distribution in 2017, the Fund's NAV reflected a valuation of ten INR – or roughly 15 cents (U.S.) – for each share of HPL held by the Fund, representing the cost basis of the investment.  Even though the purpose of the Fund – and of locking up investors' capital for almost two decades – was to realize appreciation on the Fund's investments and return it pro rata to investors, the NAV amount paid to the Fund's members such as Plaintiff in May 2017 reflected the initial price at which the Fund acquired the shares in the 1990s.  In effect, Defendants were simply returning investors' money after holding it for nearly 20 years, with *no* return on capital.

9.     Defendants did not do this because the HPL shares were impaired or virtually worthless, or because ten INR per share was the most Defendants could get for them in an arms-length transaction.  Contrary to the LLC Agreement's requirement that a final distribution be made *after* the Fund's investments are liquidated and the Fund is dissolved, there was no arms-length transaction – there was only self-dealing by Defendants.  Defendants simply kept the HPL shares for themselves, at a time when HPL had significantly increased in value and was poised

for additional growth, while cashing out the Fund's members based on the improperly deflated NAV.  Upon information and belief, and as Plaintiff will demonstrate in this action, the fair market value of HPL shares in 2017 was orders of magnitude greater than the NAV calculated by Defendants.  By way of example only, in the fiscal year leading up to the final distribution, HPL's EBITDA was INR 36,879.16 million, or approximately U.S. $570 million, its highest ever.  Just a few months after the final distribution, the Indian press touted HPL's turnaround and noted that HPL "has emerged as the second most profitable private sector company out of Bengal."

10.     Notably, despite repeated requests by Plaintiff, Defendants have never provided information that remotely justifies the ten INR per share valuation of HPL shares used for the final distribution.

11.     By purporting to make a final distribution to investors at the artificially low NAV prior to the dissolution of the Fund, and using such NAV instead of fair market value for purposes of determining the final distribution payment, Chatterjee Advisors breached the LLC Agreement and the implied covenant of good faith and fair dealing, as well as its fiduciary duties to Plaintiff.  Plaintiff is entitled to damages in the amount of the difference between the NAV amount paid and the fair market value for its interest in the Fund that it was entitled to receive in the May 2017 liquidation.

12.     Chatterjee Advisors did not commit these material breaches alone.  In fact, the other Defendants, including Chatterjee, implemented the final distribution substantially below fair market value as part of a bad faith scheme to benefit themselves at the direct expense of Plaintiff.  By doing so, the other Defendants engaged in tortious interference with contract, and have been unjustly enriched at the direct expense of Plaintiff.  These other Defendants, as

ultimate controllers of the Fund, also breached their fiduciary duties to Plaintiff by benefitting themselves at the expense of the Fund's investors.  In the alternative, these other Defendants aided and abetted Chatterjee Advisors' breach of fiduciary duty by knowingly and substantially assisting such breach.

13.     Defendants are therefore jointly and severally liable to pay damages to Plaintiff to make it whole.

**JURISDICTION AND VENUE**

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

15.     Manbro is an Ohio corporation with its principal place of business in Ohio.

16.     Chatterjee Advisors is a Delaware limited liability company whose members are citizens of New York and Delaware, and with its principal place of business in New York, New York.  Chatterjee Fund Management is a private partnership whose partners are citizens of New York and the Isle of Man, and with its principal place of business in New York, New York.  CMC is a Delaware corporation with its principal place of business in New York, New York.  CMC does business as The Chatterjee Group ("TCG").  Chatterjee is a United States citizen and principally resides in the State of New York.

17.     The amount in controversy exceeds $75,000, exclusive of interests and costs.

18.     The Court has personal jurisdiction over all Defendants because they reside or have their principal place of business within this District.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events that gave rise to the claims alleged in this Complaint occurred in this District.  In addition, Defendants conduct business and maintain their principal places of business in this District.  Defendants have stated that they "do not object to venue in this Court." Joint Letter to the Court at 3 (ECF No. 34), Aug. 17, 2020.

## PARTIES AND RELATIONSHIPS AMONG THEM

20.      Manbro is a privately held company that makes strategic investments on behalf of its ultimate beneficiaries.  In 1996, Manbro invested $10,032,877 in Winston Partners II, LLC ("WP-II"), a hedge fund run by Chatterjee and TCG.  A portion of Manbro's stake in WP-II was subsequently rolled into WPPE in 1998, as explained below.

21.      Non-party WP-II is a Delaware limited liability company formed in 1995.  The principal purpose of WP-II was to act as a hedge fund with a particular focus on international investment opportunities.

22.      Non-party WPPE was formed as a Delaware limited liability company in 1998. As explained below, the principal purpose of WPPE was to hold nonmarketable investments initially made by WP-II and rolled over into WPPE.

23.      Non-party HPL is an Indian petrochemicals company.  HPL was the only material investment remaining in WPPE by the time of its purported dissolution in May 2017.  Chatterjee is Chairman and Director of HPL and, through his ultimate beneficial ownership of affiliated entities, including Defendants, owns and controls over 70% of HPL as of late 2018.  Chatterjee's brother is the "Director-in-Charge" of HPL.

24.      Defendant Chatterjee Advisors is a Delaware limited liability company with its principal place of business in New York, New York.  Chatterjee Advisors is the entity designated as the Fund Manager in WPPE's LLC Agreement.

25.      Defendant Chatterjee Fund Management is a Delaware corporation with its principal place of business in New York, New York.  As explained below, Chatterjee Fund Management is the entity that sent the redemption letter to WPPE investors, dated May 17, 2017, purporting to dissolve the Fund and cash out all Fund members at NAV (the "Final Distribution Letter").

26.     Defendant CMC, doing business as TCG, is an SEC-registered investment advisor incorporated in Delaware, with its principal place of business in New York, New York. CMC/TCG acted as investment advisor of the Fund.  CMC/TCG also operates as an umbrella organization for the Chatterjee entities.

27.     Defendant Chatterjee is an individual who resides in New York, New York.  He indirectly or directly manages or controls hundreds of millions of dollars through various companies located both within and outside of the United States, including the other Defendants named herein.  Chatterjee is the Chairman and Founder of CMC/TCG and, upon information and belief, exercises control over the operations of each of the other Defendants named herein.

## SUBSTANTIVE ALLEGATIONS

### I.     ORIGINAL MANBRO INVESTMENT IN WP-II (1996-1999)

28.     In 1996, Manbro made an investment of $10,032,877 in WP-II by purchasing membership units.

29.     WP-II was subject to certain restrictions on the type and amount of investments the fund could make.  The general objective of WP-II was "to achieve extraordinary returns" for its investors.

30.     WP-II was managed by Chatterjee Advisors, and investment services were provided by CMC.  Both entities were directly or indirectly managed and controlled by Chatterjee, and thus Chatterjee had total control over all aspects of the operations and investments of WP-II.

31.     WP-II's 1996 Information Memorandum explained that CMC's management fees would be calculated annually based on each year's "new net profits," a performance-based metric that would depend upon the NAV of the fund.

32.     A change in the NAV for nonmarketable investments, as explained by the Information Memorandum, "reflects only realized profit or loss . . . [and] unrealized appreciation is not taken into account."  In other words, WP-II carried its nonmarketable (i.e., illiquid) investments using an NAV metric that reflected the lesser of cost or fair market value.

33.     WP-II's Information Memorandum, later incorporated by reference into WPPE's Information Statement, expressly noted that this NAV accounting methodology might diverge from fair market value:  "Winston LLC's practice of valuing illiquid investments at or below cost may result in understating . . . the fair market value of Winston LLC's net assets."

34.     The Information Memorandum further noted that NAV might not reflect the value that would ultimately be realized upon sale of the fund's investments:  "Prospective investors should understand that the Investment Advisor's judgment regarding the appropriate valuation of an investment held by Winston LLC may not reflect *the value ultimately realized upon sale of the investment in such company*." (emphasis added).

35.     In 1999, Manbro elected to have its interests in the marketable, liquid investments made by WP-II redeemed, and Chatterjee Advisors complied with that request, paying Manbro a distribution based on its pro rata share of the fair market value of those investments.  Manbro's interests in the fund's illiquid investments were rolled over into WPPE, as explained next.

## II.     TRANSFER OF WP-II'S ILLIQUID INVESTMENTS INTO WPPE (BEGINNING 1998)

36.     In 1998, Chatterjee decided to create a separate fund for illiquid investments in order to hold positions longer to maturity and maximize value.  Defendants thus formed WPPE for that purpose.

37.     In particular, Manbro was informed by CMC that all of WP-II's non-freely transferable assets, or "all portfolio investments that are not readily marketable," would be

contributed into a related "subsidiary" called WPPE in return for membership units of that company. These assets included WP-II's stake in HPL.

38.     The WPPE subscription documents provided for a "series" of interests in WPPE based on pro rata shares of WP-II's nonmarketable investment portfolio. Net cash proceeds were to be provided to Fund members as investments were realized in subsequent years. The Information Statement stated that the "principal investment objective" of the Fund would be "to dispose of its existing investment positions in an orderly manner that is intended to maximize long-term values for both former and continuing members."

39.     Consistent with the purpose of making long-term investments from which it would take time to realize value, the new Fund's LLC Agreement – which was drafted solely by Defendants – imposed tight restrictions on the ability of any of the Fund's members to transfer their interests or have their interests redeemed by the company before appreciation on its investments was realized.

40.     Section 13(a) of the LLC Agreement provided that during the life of the Fund, members did not have the right to distributions except those made at the Fund Manager's discretion. However, that section recognized that members *would* have the right to receive pro rata distributions upon dissolution of the LLC, consistent with the stated "principal investment objective" of disposing investment positions in such a way as to maximize value for the Fund's members. Furthermore, such distributions would reflect "the value of the capital account of the member."

41.     Section 13(b) of the LLC Agreement provided that distributions would be made to members at the discretion of the Fund Manager, consistent with the Fund's Information Statement. The "Distribution Policy" set forth in the Information Statement provided that the

Manager would only distribute net cash proceeds from "realized investments, except to the extent of amounts determined by the Investment Advisor in its discretion to be appropriate as reserves for anticipated future commitments and contingencies."

42.     In short, until underlying investments were liquidated, no member could transfer their interests or have their interests redeemed without the approval of the Fund Manager, which was controlled by Chatterjee, enabling him to lock up investors' capital for decades.  But in return, Chatterjee and the other Defendants he controlled agreed to seek maximum returns on behalf of all investors and to share the proceeds of the Fund's investments upon liquidation.

III.    **ADVERSE OPINION FROM THE FUND'S AUDITORS (2012)**

43.     WPPE was required to provide annual audited financial statements to its members.

44.     Until 2012, Manbro received annual audited financial statements for WPPE.  By that time, after most of the Fund's investments had been liquidated, and the proceeds distributed to members, more than 90% of the capital remaining in the Fund was invested in HPL.

45.     WPPE's audited financial statements across these years reported a carrying value for HPL shares at their investment cost (adjusted for impairment) value.

46.     In 2012, WPPE received an adverse opinion from its auditors Withum Smith and Brown ("Withum").  In accordance with its NAV valuation methodology for nonmarketable investments, WPPE reported to the auditor its HPL investment based on "cost adjusted for impairment."  The auditors' report in 2012, however, stated that "the financial statements . . . do not present fairly, in all material respects, the financial position of Winston Partners Private Equity, LLC."  The notes to the audited financial statements further elaborated:  "As described above, the Fund has presented non-marketable investments at cost adjusted for impairments that are determined by the Investment Advisor to be other than temporary.  In our opinion, generally

accepted accounting principles in the United States of America require such investments be presented at fair value."

47.     This adverse opinion was based on the fair value accounting standard introduced in 2006 by the U.S. Financial Accounting Standards Board, applicable to U.S.-based funds beginning in 2008.  These accounting rules are designed to standardize the valuation of illiquid assets by replacing historical cost accounting with a "mark to market" method of measuring fair value.  Notwithstanding these U.S. accounting rules, WPPE took no steps to comply with them even after Withum's adverse audit report.  The Fund simply stopped submitting to outside audit, and it submitted no further audited financial statements from that point forward.

48.     Approximately two years later, in 2014, after being repeatedly pressed by Manbro (having not received 2012 audited financial statements from WPPE), the Fund finally admitted that it had received the adverse opinion from its outside auditor in 2012.  When asked why subsequent years' audited financial statements were not provided, Defendants responded that this was not improper, because Defendants had unilaterally decided to stop charging management fees on Manbro's invested capital since 2012.

49.     In other words, Defendants implicitly conceded that NAV was not an accurate measure of fair market value, but took the position that it did not matter because NAV was not being relied upon in any transaction.  That would soon change, however, when Defendants purported to use the below-market NAV to cash out investors in the Fund.

## IV.    PURPORTED FUND DISSOLUTION AND "FINAL DISTRIBUTION" PAYMENT (MAY 2017)

50.     Following several years of reduced earnings and a restructuring, by April 2017, Indian business media sources reported that the "[g]ood times are back at Haldia Petrochemicals," and the company was on a stronger footing, having "wiped out its accumulated

losses in 2016-2017 and started the new fiscal [year] with a cash balance of nearly 4,100 crore [i.e., approximately U.S. $630 million.]." Pratim Ranjam Bose, "How Haldia Petrochemicals got back its mojo," *Hindu Bus. Live*, Apr. 18, 2017. Instead of finally making good on maximizing value for investors, after nearly 20 years, Defendants saw an opportunity to capture the upside of this long-term investment for themselves.

51.     On or about May 17, 2017, with no warning or explanation, Manbro received a Final Distribution Letter, signed by Chatterjee on behalf of Chatterjee Fund Management, and addressed to all investors in the Fund. The letter had the subject line "Fund Liquidation" and stated:

> We are glad to be able to announce that the Fund has begun the process of dissolution. Our goal is to complete final cash distributions to our partners by June 30, 2017. Each partner's final distribution will be in the amount of their respective Fund NAV as of March 31, 2017.

52.     CMC/TCG informed Manbro that the "unaudited" NAV of its 9,876,864 shares in WPPE as of March 31, 2017 – i.e., the price Defendants were paying to redeem Manbro – was $2,394,142.37.

53.     This redemption price set by Defendants reflected the ten INR per share price for HPL shares held by the Fund, representing the initial price that the Fund, through Defendants, acquired the shares in the 1990s.

54.     Even though WPPE's auditors had given an adverse opinion, and even though Defendants had earlier conceded that NAV was not fair market value, this letter did not purport to say that the distribution was intended to reflect the fair market value of the shares as of that time, or that it reflected a realization event (such as an arm's length sale).

55.     Manbro responded to the Final Distribution Letter by requesting an explanation of the "final distribution," did not countersign that letter, and communicated to Defendants that Manbro refused to accept the redemption payment without further information.

56.     After repeated requests for clarification by Manbro as to the basis for the redemption payment, Defendants finally supplied a purported valuation report from an Indian firm called "Bose Consultant."  This report purported to conclude that the HPL shares held by Defendants were worth no more than the ten INR per share "book" (or investment cost) value.

57.     It is clear that this report was not relied upon by Defendants to support the final distribution as of March 31, 2017 (which was not communicated to investors until May 2017), but was instead provided in a post-hoc attempt to justify that improper distribution.  Among other things, the Bose Consultant report expressly noted that the "Value Analysis carried out by us is solely for regulatory/ non-financial reporting purposes and *is not to be used for determining the carrying value of the relevant assets / liabilities in any financial statements*." (emphasis added).

58.     In addition, the Bose Consultant report is dated January 31, 2017 – more than three months before the Final Distribution Letter – and measured accounts for the fiscal year ending March 31, 2016.  This is particularly significant because it meant that Bose Consultant did not have the results of HPL's 2017 fiscal year, which ended on March 31, 2017 – which, as noted below, saw a substantial turnaround of the business and the company's "highest ever" EBITDA.  By the time of the Final Distribution Letter in May 2017, therefore, the Bose Consultant report's analysis was 14-months stale, despite a financial turnaround in HPL during that period.

59.     Finally, the Bose Consultant report based its opinion that Defendants' investment cost basis was an appropriate valuation for the HPL shares on its belief that "there is a huge contingent liability of Rs 3,171 CR which represented Bank guarantees to customs authority for export commitments yet to be fulfilled.  This commitment arose as HPL had imported duty free naphtha in the previous years."  However, in the audited financial statements HPL subsequently issued for its fiscal year 2017 – which were not available at the time of the Bose Consultant report – HPL itself disclosed that this "huge contingent liability" was a non-issue:  "The Company is confident to meet the pending export obligation within the said extended period *and is thus not envisaging any liability in this matter*." (emphasis added).

60.     A redemption price of ten INR per share, or roughly 15 cents (U.S.), representing the cost of an investment in the 1990s, is in no way comparable to the fair market value of those shares in 2017.  For instance, in fiscal year 2017, HPL earned approximately INR 36,879.16 million, or approximately U.S. $570 million, in its "highest ever" EBITDA to date.  Applying any reasonable multiple to that amount of EBITDA would result in a per-share value of HPL that is orders of magnitude higher than ten INR per share.

61.     Just a few months after the Final Distribution Letter, the *Telegraph*, an English-language newspaper published in Kolkata, India, reported that "Purnendu Chatterjee's Haldia Petrochemicals has emerged as the second most profitable private sector company out of Bengal after scripting a remarkable turnaround of its business."  *See* Sambit Saha, "HPL catches profit pulse," *The Telegraph (Kolkata)*, Aug. 28, 2017.

62.     The sudden timing of Defendants' decision to redeem the Fund's members at below-market NAV shortly following HPL's "highest ever" year of EBITDA, and "after scripting a remarkable turnaround" to become one of the "most profitable" companies in the

region, demonstrates Defendants' clear intent to improperly take HPL's gains for themselves at the expense of the investors.

63.     Manbro did not agree to accept the purported redemption amount.  However, on or about November 1, 2018, without agreement by Manbro and without its foreknowledge, Defendants voluntarily and unconditionally wire transferred the purported redemption amount into one of Manbro's accounts.  Thereafter, Manbro expressly made clear to Defendants – and Defendants have acknowledged – that its acceptance of those funds was without prejudice to its claim that it was owed far more.

## V.     MANBRO SEEKS ADDITIONAL INFORMATION FROM CHATTERJEE, BUT DEFENDANTS STONEWALL MANBRO

64.     In the nearly three years since Defendants purported to make the final distribution at NAV, Manbro has sought further information from Defendants in order to assess the adequacy of that distribution and its rights under the LLC Agreement, as it is entitled to do under the agreement and Delaware law.  Rather than comply with such reasonable requests, however, Defendants have provided virtually no information, apparently hoping Manbro would just give up and walk away.

65.     After receiving the Bose Consultant report, which as discussed above did not substantiate the adequacy of the NAV payment, and seeking to exercise information rights as an investor in WPPE, Manbro in late 2018 again requested additional information about the HPL investment.  After multiple requests went unanswered, Manbro finally made a formal books and records request under Delaware law, and in response received the WPPE LLC Agreement and a spreadsheet purporting to show that the payment to Manbro represented about 20% of the redemption payments made around that time, but from which the names of the other investors were redacted.

66.     From this and other information Manbro has collected, including provisions of the LLC Agreement guiding valuation and redemptions, it became apparent that the final distribution was in breach of the agreement.

67.     Moreover, Manbro's investigation revealed that Chatterjee Petrochemical (Mauritius) Company – the Chatterjee-related entity through which WPPE invested in HPL – held a consistent shareholding of 432,857,148 shares, or 25.64% of the company, between June 2013 and October 2018.  This timeline encompasses the transaction referenced in the Final Distribution Letter that purported to redeem Manbro and the Fund's investors.  In other words, it became clear that by the final distribution and dissolution of the Fund, Defendants had effectively transferred the HPL shares to themselves at a severely discounted price at the expense of the Fund's investors.

## CAUSES OF ACTION

### COUNT I:
### Breach of Contract
### (Against Chatterjee Advisors)

68.     Plaintiff realleges each allegation above, as though fully set forth herein.

69.     Plaintiff and the Fund Manager are parties to the LLC Agreement.

70.     The LLC Agreement is a valid and binding contract governed by Delaware law.

71.     Plaintiff has performed its obligations under the LLC Agreement in all material respects.

72.     In the Final Distribution Letter, Chatterjee Fund Management stated that it had "begun" the process of "dissolving" the Fund.  In sending such letter, Chatterjee Fund Management purported to act on behalf of the Fund Manager, Chatterjee Advisors, which was responsible under the LLC Agreement for determining the amount of distributions and making such distributions.

73.     In making the Final Distribution *before* the Fund had been properly dissolved, and using the artificially low NAV to do so, however, the Fund Manager breached the LLC Agreement.

74.     First, consistent with the "principal investment objective" of the Fund (as described by Defendants themselves), which was "to dispose of its existing investment positions in an orderly manner that is intended to maximize long-term values for both former and continuing members," nothing in the LLC Agreement authorizes the Fund Manager to wind up the Fund by making a final distribution to members at NAV *before* dissolving the Fund (i.e., before liquidating the assets held by the Fund in a market transaction and distributing the proceeds to investors).

75.     In fact, Section 13(a) of the LLC Agreement confirms that members are entitled to distributions *after* realization of the Fund's investments are made in connection with the dissolution of the Fund.  Specifically, it provides:  "No Member shall . . . have the right to distributions . . . except . . . upon dissolution of the LLC."  In other words, while the Fund Manager is not required to make distributions to members before dissolution, it *is* required to make distributions to members of realized profits on a pro rata basis when the Fund is actually dissolved by liquidating its assets.

76.     Second, the Fund Manager was not authorized under the LLC Agreement to make final distributions to members at NAV instead of the fair market value that could have been realized in an arms' length sale of the Fund's HPL shares, which substantially exceeded the NAV amount reflected in the Fund Manager's purported distribution.  Although the Fund Manager calculated NAV on a "cost less impairment" basis, the Fund Manager was required to

realize appreciation on the Fund's investments and distribute the proceeds to investors on a pro rata basis.

77.     By providing a purportedly "final distribution" before dissolving the Fund, and then failing to make a distribution of the proceeds at fair market value once the Fund was actually dissolved, the Fund Manager breached the LLC Agreement.

78.     Plaintiff suffered damages as a direct and proximate result of these breaches of the LLC Agreement in an amount to be determined at trial.

**COUNT II:**
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**(Against Chatterjee Advisors)**

79.     Plaintiff realleges each allegation above, as though fully set forth herein.

80.     There is implied in every contract a covenant of good faith and fair dealing such that no party to such contract may act to deprive the other of the benefits and bargains of the agreement.

81.     The implied covenant cannot be disclaimed as a matter of law.  In any event, Section 19 of the LLC Agreement expressly preserves the right of any Fund member to sue the Fund Manager for "acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law or for any transaction from which the manager derived an improper personal benefit."

82.     Chatterjee Advisors was thus bound by an implied-in-law covenant under the LLC Agreement to perform its obligations in good faith and not take any action that might deprive Plaintiff of the benefits of the bargain under the LLC Agreement.

83.     As noted above, "[t]he principal investment objective" the Fund was, as described by Defendants, "to dispose of its existing investment positions in an orderly manner that is intended to maximize long-term values for both former and continuing members."

84.     There are no express terms in the LLC Agreement that permit the Fund Manager to make "final" distributions to members at below-market NAV before dissolving the Fund.

85.     Upon information and belief, and as will be demonstrated in this action, the fair market value, or the value that could have been realized in an arms' length sale of the Fund's HPL shares, substantially exceeded this "NAV" amount reflected in the Fund Manager's purported distribution payment to Plaintiff.

86.     By making the "final" distribution payment at below-market NAV before dissolving the Fund, the Fund Manager effectively reserved for itself and its affiliates – including, ultimately, Chatterjee – any profit to be realized from the Fund's investment in HPL shares, which should have been shared pro rata among the Fund's members.

87.     This constitutes improper self-dealing, is manifestly unfair, and defeats the very purpose of the LLC Agreement.  It thus cannot be attributed to a good faith attempt by the Fund Manager to fulfill its duties as manager of the Fund.

88.     Plaintiff has suffered damages as a direct and proximate result of Chatterjee Advisors' breaches of the implied covenant of good faith and fair dealing in an amount to be determined at trial.

### COUNT III:
### Tortious Interference with Contractual Relations
### (Against Chatterjee Fund Management, CMC, and Chatterjee)

89.     Plaintiff realleges each allegation above, as though fully set forth herein.

90.     Chatterjee Fund Management, CMC, and Chatterjee knew about the existence, terms, and validity of the LLC Agreement and intentionally and improperly procured a breach of that Agreement without justification.

91.     In particular, Chatterjee Fund Management, CMC, and Chatterjee intentionally and without justification or privilege orchestrated the scheme to have Chatterjee Advisors make

a final distribution to members of the Fund at below-market NAV, thereby benefiting Defendants who kept the underlying HPL shares for themselves.

92.     The Final Distribution Letter was sent by Chatterjee on Chatterjee Fund Management's letterhead, and the amount of Plaintiff's NAV as of March 31, 2017 (used to set the redemption price) was provided by CMC/TCG, even though distributions under the LLC Agreement are the responsibility of the Fund Manager, Chatterjee Advisors.

93.     As a direct and proximate result of the misconduct of Chatterjee Fund Management, CMC, and Chatterjee, Plaintiff has been injured by being deprived the benefit of its bargain in an amount to be determined at trial.

## COUNT IV:
### Breach of Fiduciary Duty
**(Against Chatterjee Advisors, Chatterjee Fund Management, CMC, and Chatterjee)**

94.     Plaintiff realleges each allegation above, as though fully set forth herein.

95.     As Fund Manager of the Fund, Chatterjee Advisors owed fiduciary duties to Plaintiff, including the duties to act in good faith and with loyalty to Plaintiff.  While Section 19 of the LLC agreement exculpates Chatterjee Advisors from monetary liability for breaches of the fiduciary duty of care, it expressly preserves the right of any Fund member to sue the Fund Manager "for acts or omissions not in good faith" or "for any transaction from which the manager derived an improper personal benefit" – i.e., for breaches of the duty of loyalty.

96.     Because Chatterjee Fund Management, CMC, and Chatterjee controlled Chatterjee Advisors and substantially participated in the management of the Fund, including the breaches described herein, they were ultimate controllers of the Fund under Delaware law. Accordingly, Chatterjee Fund Management, CMC, and Chatterjee also owed fiduciary duties to Plaintiff, including the duty not to use the Fund's investments to benefit themselves at the expense of the Fund's investors.

97.     By making the "final" distribution payment at below-market NAV before dissolving the Fund, while keeping the HPL shares for themselves, Defendants engaged in improper self-dealing, benefited themselves at the expense of the Fund's investors, and thereby breached the fiduciary duty of loyalty they owed to Plaintiff.

98.     Plaintiff has suffered damages as a direct and proximate result of the Defendants' breach of the fiduciary duty of loyalty in an amount to be determined at trial.

**COUNT V:**
**Aiding and Abetting Breach of Fiduciary Duty**
**(Against Chatterjee Fund Management, CMC, and Chatterjee)**

99.     Plaintiff realleges each allegation above, as though fully set forth herein.

100.    As alleged above, as Fund Manager of the Fund, Chatterjee Advisors owed fiduciary duties of good faith and loyalty to Plaintiff, and breached those duties by engaging in the self-dealing final distribution.

101.    In the event Chatterjee Fund Management, CMC, and/or Chatterjee did not themselves owe fiduciary duties, these Defendants are liable in the alternative for aiding and abetting the breaches of fiduciary duty as alleged herein because they knowingly participated in the self-dealing scheme by which Defendants benefited at the expense of the Fund's investors.

102.    For example, Chatterjee signed the Final Distribution Letter to all investors in the Fund on behalf of Chatterjee Fund Management, stating that the "final distribution will be in the amount of [each investor's] respective Fund NAV as of March 31, 2017." And CMC/TCG informed Plaintiff of the amount of Plaintiff's NAV as of March 31, 2017, which was below market and was used to set the redemption price.

103.    Plaintiff has suffered damages as a direct and proximate result of the Defendants' concerted action in an amount to be determined at trial.

**COUNT VI:**
**Unjust Enrichment**
**(Against Chatterjee Advisors, Chatterjee Fund Management, CMC, and Chatterjee)**

104.    Plaintiff realleges each allegation above, as though fully set forth herein.

105.    Chatterjee Advisors, Chatterjee Fund Management, CMC, and Chatterjee benefitted from and were enriched by the orchestration of the improper "final distribution" and received windfall profits as a result of cashing out investors of the Fund, including Plaintiff, at below fair market value without justification while they kept the underlying HPL shares formerly held by the Fund for themselves.

106.    It would be inequitable for Defendants to retain this benefit at the expense of Plaintiff.

107.    In the absence of a remedy provided by law, Plaintiff is entitled to damages in the amount of the benefit improperly bestowed on Chatterjee Advisors, Chatterjee Fund Management, CMC, and Chatterjee at the direct expense of Plaintiff, as described above, in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for relief and judgment as follows:

a)    Awarding Plaintiff joint and several damages against Defendants in an amount to be determined at trial;

b)    Awarding Plaintiff prejudgment interest;

c)    Awarding Plaintiff the costs, expenses, and disbursements of this action, including attorneys' and experts' fees; and

d)    Awarding Plaintiff such other and further relief as this Court may deem just, equitable, and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury in this

action of all issues so triable.


Dated:  New York, New York
        June 8, 2021

CLEARY GOTTLIEB STEEN & HAMILTON
LLP

*/s/ Joon H. Kim*
Joon H. Kim
Victor L. Hou
Rahul Mukhi
Mark E. McDonald
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999


*Attorneys for Plaintiff Manbro Energy Corporation*

24