# Exhibit F

```
 1            CONFIDENTIAL - JONATHAN McCLOSKEY

 2         IN THE UNITED STATES DISTRICT COURT

 3            SOUTHERN DISTRICT OF NEW YORK

 4

 5    -------------------------------x

 6  MANBRO ENERGY CORPORATION,
    individually and on behalf of
 7  all those similarly situated,

 8               Plaintiffs,       Case No.
                                20 Civ. 3773 (LGS)
 9          v.

10  CHATTERJEE ADVISORS, LLC,
    CHATTERJEE FUND MANAGEMENT, LP,
11  CHATTERJEE MANAGEMENT COMPANY,
    d/b/a THE CHATTERJEE GROUP, and
12  PURNENDU CHATTERJEE,

13               Defendants.

14  -------------------------------x

15

16              *** CONFIDENTIAL ***

17

18     VIDEOTAPED DEPOSITION OF JONATHAN McCLOSKEY

19             Via Remote Videoconference

20                Monday, May 3, 2021

21

22

23  Reported by:

24  Michele E. Eddy, RPR, CRR, CLR

25  JOB NO. 193113
```

```
                                        Page 266
 1       CONFIDENTIAL - JONATHAN McCLOSKEY
 2   some time.  If you wanted to make an
 3   application, you could have, but my
 4   instruction for purposes of this deposition
 5   stands.
 6          MR. SHERWOOD:  Understood.  Thank
 7   you, Mr. McDonald.  We object to any
 8   assertion of privilege over any
 9   communications with Emissary Holdings.
10       Q    Mr. McCloskey, is --
11          MR. McDONALD:  Mr. Sherwood, just for
12   the record, it's not just the
13   attorney-client privilege.  We are talking
14   about ongoing litigation, and there is also
15   something called attorney work product
16   doctrine.  But in any event, that is just
17   for the record.  You may proceed.
18          MR. SHERWOOD:  For purposes of the
19   record, we object to the assertion of any
20   privilege.
21   BY MR. SHERWOOD:
22       Q    Mr. McCloskey, who supervised
23    Emissary Holdings' work on behalf of Manbro or
24    Parkwood?
25       A    It would have been Chaya Slain until
```

```
                                        Page 267
 1       CONFIDENTIAL - JONATHAN McCLOSKEY
 2   she left and then Joe Cary after she left.
 3       Q    You did not supervise Emissary
 4   Holdings' work?
 5       A    I mean, how do you define supervise
 6   specifically?  I'm the boss of those two folks
 7   that I mentioned, so I'm involved.
 8       Q    Did Ms. Slain or Mr. Cary come to you
 9   to seek advice, guidance, or instruction in
10   connection with their supervision of Emissary
11   Holdings' work?
12       A    From time to time.
13       Q    And about what matters did they seek
14   your advice, guidance, or instruction?
15       A    I guess what are you -- do you have
16   any specifics to ask about that or --
17       Q    I'm asking for your recollection.
18       A    Yeah, there were multiple milestones
19   in the project, and, you know, we could discuss
20   any of them.
21       Q    The milestones you reference, what
22   were those milestones?
23       A    I think foremost, to try to get a
24   good, independent valuation understanding of
25   what -- what Haldia was worth on the date the
```

```
                                        Page 268
 1       CONFIDENTIAL - JONATHAN McCLOSKEY
 2   distribution was made or the release was made.
 3   Pardon me.
 4          Then at one point after that, there
 5   was, you know, just discussions whether we seek
 6   to bring in outside counsel in addition to
 7   Jones Day or open discussions with
 8   Dr. Chatterjee.  So that was one of the
 9   milestones.  Another was, I believe, an RFP
10   process for outside counsel, to which I think
11   the bottom result was Corsaro joining the
12   process.  And then ultimately there was another
13   RFP process for a more significant law firm,
14   and that's where Cleary came into the process.
15       Q    Put aside the meetings that you
16   testified you had or, rather, the meetings we
17   -- withdrawn.
18          How often did you communicate with
19   Mr. McGrath over email?
20       A    In terms of me writing to Matt, not
21   very often.
22       Q    How often would you say?
23       A    Maybe a few times a quarter at most.
24       Q    How often would he write to you
25   about -- withdrawn.
```

```
                                        Page 269
 1       CONFIDENTIAL - JONATHAN McCLOSKEY
 2          How often would he write to you?
 3       A    I think he would -- he would write to
 4   the analyst, Chaya or Joe, and cc me maybe once
 5   or twice a month.
 6       Q    Did Emissary Holdings provide
 7   information to you other than verbally or over
 8   email?  Allow me to rephrase my question.  My
 9   apologies.  Withdrawn.
10          Did Emissary Holdings provide you
11   with any reports, memoranda, or other written
12   material?
13       A    I'm sure he did produce some of
14   those.
15       Q    Are you aware that Emissary Holdings
16   was communicating with the press in connection
17   with this dispute?
18       A    Yes.
19       Q    Are you familiar with any
20   instructions that Parkwood gave to Emissary
21   Holdings with respect to press communications?
22       A    No.
23       Q    Did you discuss with anyone Emissary
24   Holdings' strategy with respect to the press?
25       A    I'm sure it was -- it was brought up
```

Page 270

CONFIDENTIAL - JONATHAN McCLOSKEY

1
2  in one of the many Zooms.
3     Q   When you say you were sure that it
4  was brought up in one of those many Zooms, do
5  you have a specific recollection of that?
6     A   I don't specifically, but I'm
7  assuming it was since Cleary was brought into
8  the picture.
9     Q   Did you ever receive any oral reports
10 or updates about guidance or instruction given
11 to Emissary Holdings regarding its press
12 communications?
13    A   Receive reports on instructions given
14 to Emissary Holdings by Parkwood?
15    Q   I'll rephrase my question.
16        Did anyone from Manbro or Parkwood
17 ever speak to you about advice or instruction
18 provided to Emissary Holdings in connection
19 with the press outreach relating to this
20 dispute?
21    A   Not that I recall.  We were on a Zoom
22 when this was discussed.
23    Q   Okay.  Do you recall any discussion
24 other than that Zoom call about Emissary
25 Holdings' press outreach?

Page 271

CONFIDENTIAL - JONATHAN McCLOSKEY

1
2     A   I don't believe so.
3     Q   Who was present on that Zoom call?
4     A   I believe the working group.  I don't
5  recall specifically, but I believe the working
6  group that includes Emissary, Adrian, Peter
7  Donald, Cleary, Joe Cary, maybe Rob Sherman and
8  maybe Brad Smith.
9     Q   When was that Zoom call?
10    A   I'm guessing in 2020 sometime.
11    Q   What was the substance of the
12 discussion on that Zoom call?
13        MR. McDONALD:  I'll object to the
14    question.  He testified that there were
15    multiple lawyers on the call, but if you
16    want to carve out a discussion of press
17    strategy, I think that's probably
18    privileged, but for purposes of allowing
19    this deposition to proceed, you can -- if
20    you want to carve that out, you can ask a
21    question about that.  Without waiving any
22    rights, I'll allow that.
23    Q   And Mr. McCloskey, you are going --
24 you're not -- withdrawn.
25        Mr. McCloskey, you are not going to

Page 272

CONFIDENTIAL - JONATHAN McCLOSKEY

1
2  answer the question I just asked you without
3  the limitation your counsel just stated,
4  correct?
5     A   Like --
6     Q   Let me rephrase my question.
7  Withdrawn.
8         You are going to adhere to your
9  counsel's instruction he just gave right now,
10 correct?
11    A   I'll do my best.
12    Q   Okay.  Mr. McCloskey, putting aside
13 legal advice solicited or received during that
14 Zoom call, what was the substance of the
15 discussion regarding Emissary Holdings' press
16 strategy?
17    A   You know, I believe it was one -- one
18 PR effort by Peter Donald.  And I know it was
19 to include only the facts of the case.
20    Q   Okay.  Did anyone from Manbro or
21 Parkwood provide Mr. Donald any instructions
22 regarding Emissary Holdings' press outreach?
23    A   I don't believe so.
24    Q   What did Mr. Donald tell you about
25 Emissary Holdings' press outreach during that

Page 273

CONFIDENTIAL - JONATHAN McCLOSKEY

1
2  call?
3     A   I believe it was just to include only
4  the facts of the case and beyond that, to place
5  articles or to hope that they get placed.  I
6  don't understand the mechanics, but that was
7  his effort.
8         MR. SHERWOOD:  So we're nearing the
9     end here, and so I would like to go off the
10    record and confer with my colleague, and
11    then we can come back and finish up.
12        MR. McDONALD:  We have taken a lot of
13    breaks.  If it's going to help you
14    streamline and get this over with, it's
15    been a long day, it is getting late, that
16    would be appreciated.
17        MR. SHERWOOD:  Okay.
18        MR. McDONALD:  Let's go off the
19    record.
20        VIDEO TECHNICIAN:  The time is 6 p.m.
21    and we are going off the record.
22        (A brief recess was taken.)
23        VIDEO TECHNICIAN:  The time is 6:06
24    p.m. and we are back on the record.
25

Page 274

CONFIDENTIAL - JONATHAN McCLOSKEY

BY MR. SHERWOOD:
Q   Mr. McCloskey, do you know whether any articles were published as a result of Emissary Holdings' press outreach?
A   I believe one article was published or picked up in a periodical in India.
Q   You're aware of no other publications, whether in a newspaper or otherwise, as a result of Emissary Holdings' press outreach?
A   That's correct.
Q   Okay. Mr. McCloskey, what is a side pocket investment?
A   My understanding is that it is investments that are generally embedded in marketable funds or funds that are typically composed of marketable assets but a portion, what we side pocketed because they are either illiquid or -- generally because they're illiquid, and when you redeem, you don't redeem fully, you still own a unit of the side pocket until it's liquidated.
Q   So a side pocket investment is an illiquid investment?

Page 275

CONFIDENTIAL - JONATHAN McCLOSKEY

A   In my experience, that tends to be the reason.
Q   Just to clarify, in your experience it tends to be that side pocket investments are illiquid?
A   Yes.
Q   And a side pocket investment cannot be redeemed; is that correct?
A   Until it's liquidated by the manager.
Q   Could you please estimate for me about how many side pocket investments Parkwood has had during your tenure with the company?
A   I really don't know the answer. I can tell you it used to be more common than it is today. It became very unpopular after 2008. But prior to 2008, we probably had hedge funds in particular that had some.
Q   Do you recall any of the side pocket investments that Parkwood had? You can answer that yes or no, and then I can follow up with more specific questions.
A   I don't know specifically, but some funds have allowances for it. I have never utilized it, but we still have some very old

Page 276

CONFIDENTIAL - JONATHAN McCLOSKEY

investments that predates me that employed side pockets.
Q   Do you recall what those investments are?
A   The names of the managers you're asking or are you asking for the assets within the side pockets?
Q   Both. If you recall the names of the managers and the relevant assets, that would be helpful. If you can only recall one, that is fine too.
A   I believe that an investment made in ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇ held side pockets that took quite a while to liquidate.
Q   Could you spell that for me, ▇▇▇▇▇▇▇▇▇
A   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
Q   Is that the only -- withdrawn. ▇▇▇▇▇▇▇▇▇▇▇▇
A   ▇▇▇▇▇▇▇▇▇▇
Q   Do you recall who the fund manager of ▇▇▇▇▇▇▇▇ was?

Page 277

CONFIDENTIAL - JONATHAN McCLOSKEY

A   ▇▇▇▇▇▇▇▇
Q   Okay. Is that the only side pocket investment that you can recall?
A   At the moment, yes.
Q   Does the name ▇▇▇▇▇▇ refresh your recollection?
A   Yes.
Q   What was ▇▇▇▇▇▇▇
A   They were sort of known, I believe, as ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
Q   Do you know whether Parkwood had a side pocket investment with ▇▇▇▇▇▇?
A   I believe it did.
Q   Do you recall what happened to that investment, whether Parkwood received money or lost money on it?
A   I don't know our basis so I can't tell you if we made or lost money, but it was invested ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. And I believe there was a side pocket, but I don't know specifically, but ▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Page 282

1  CONFIDENTIAL - JONATHAN McCLOSKEY
2  Thank you, Mr. McCloskey.
3       MR. McDONALD:  Okay.  Your objection
4  is noted for the record, although
5  unexplained.  I suppose at some point, if
6  you want, you can explain your position to
7  us, and we can take it from there.  But in
8  any event, I have no further questions --
9  or I have no questions, so let's go off the
10 record.
11      VIDEO TECHNICIAN:  The time is 6:18
12 p.m. and we are going off the record.
13
14         (Time noted:  6:18 p.m.)

Page 283

2                J U R A T
6       I, JONATHAN McCLOSKEY, do hereby
7  certify under penalty of perjury that I have read
8  the foregoing transcript of my deposition taken
9  on May 3, 2021; that I have made such
10 corrections as appear noted herein in ink,
11 initialed by me; that my testimony as contained
12 herein, as corrected, is true and correct.
15 Signature: _____
17 Dated: _____

Page 284

2              C E R T I F I C A T E
3  STATE OF OHIO:
4       I, MICHELE E. EDDY, shorthand reporter,
5  do hereby certify that the witness whose
6  deposition is hereinbefore set forth was duly
7  sworn, and that such deposition is a true,
8  correct, and full record of the testimony
9  given.
10      I further certify that I am not related
11 to any of the parties to this action by blood or
12 by marriage, and that I am in no way interested
13 in the outcome of this matter.
14      IN WITNESS WHEREOF, I have hereunto set
15 my hand this 4th day of May, 2021.
17      _____
18      MICHELE E. EDDY, Shorthand Reporter

Page 285

2            - INDEX TO WITNESSES -
4  WITNESS                                    PAGE
5  JONATHAN McCLOSKEY
6  Examination by Mr. Sherwood                   6

9            - INDEX TO EXHIBITS -
10 DEFENDANTS' EXHIBIT                         MARKED
11 Exhibit 58  Document unidentified by witness   11
12 Exhibit 59  April 20th, 2021, printout of      18
13             Mr. McCloskey's biography on
14             Parkwood's website,
15             parkwoodcorp.com.
16 Exhibit 60  IMS notes from Chaya regarding   129
17             Winston
18 Exhibit 61  Email forwarded to Jonathan      186
19             McCloskey through the IMS
20             system; second page contains an
21             email from Ms. Slain to
22             Mr. Aronowitz