# Exhibit G

```
                                                                Page 1
 1            IN THE UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF NEW YORK

 3

 4   -------------------------------x

 5   MANBRO ENERGY CORPORATION,

 6   individually and on behalf of

 7   all those similarly situated,

 8                 Plaintiffs,          Case No.

 9   v.                                 20 Civ. 3773 (LGS)

10   CHATTERJEE ADVISORS, LLC,

11   CHATTERJEE FUND MANAGEMENT, LP,

12   CHATTERJEE MANAGEMENT COMPANY,

13   d/b/a THE CHATTERJEE GROUP, and

14   PURNENDU CHATTERJEE,

15                 Defendants.

16   -------------------------------x

17

18              *** CONFIDENTIAL ***

19

20       REMOTE DEPOSITION OF JOSEPH CARY

21          TAKEN BY VIDEOCONFERENCE

22               June 25, 2021

23   Reported by:

24   Anne E. Vosburgh, CSR-6804, RPR, CRR

25   Job No. 195767
```

```
                                       Page 302                                        Page 303
 1        J. Cary - Confidential                 1        J. Cary - Confidential
 2   potential settlement strategies?            2        A.   I do not.
 3        A.   I don't recall.  I know we        3        Q.   So it's fair to say that counsel
 4   certainly received estimated values based on 4   was not always present or included on
 5   specific settlement amounts, you know, trying 5   communications with Emissary Holdings, right?
 6   to estimate, again, costs and potential     6        A.   Yes.
 7   returns.                                    7        Q.   Did Emissary Holdings make a
 8        I can't remember -- I can't recall     8   preliminary estimate of the value of Manbro's
 9   if he sent like different potential         9   investment in WPPE?
10   settlement paths, something that was written. 10      A.   They did some work on the valuation
11        Q.   When did your discussions with   11   of Haldia.
12   Emissary concerning potential settlement   12        Q.   And that's the valuation estimate
13   strategy occur?                            13   that you referred to?
14        A.   Since we started talking to them. 14       A.   Yes.
15   I mean, obviously, they had to build up their 15       Q.   And that preliminary estimate was
16   knowledge of the case before we really had 16   provided to you in written work product,
17   talks, so maybe two or three months after we 17   correct?
18   engaged or something like that.            18        A.   I'm assuming.  It's been a couple
19        Q.   Are there any email exchanges    19   of years.
20   between yourself and Matt McGrath, just the 20        Q.   What information did Emissary
21   two of you?                                21   Holdings rely on in making its preliminary
22        A.   Yes.                             22   estimate?
23        Q.   Do you know if there are email   23        A.   I don't recall what information
24   exchanges between Jon McCloskey and        24   they used to make -- comparables, maybe.  I
25   Matt McGrath, just the two of them?        25   just can't be sure.

                                       Page 304                                        Page 305
 1        J. Cary - Confidential                 1        J. Cary - Confidential
 2        Q.   Would it have been only publicly  2        A.   The PR firm.
 3   available information or would --           3        Q.   Does the name Reevemark ring a
 4        A.   Yeah.                             4   bell?
 5        Q.   Only publicly available           5        A.   Yeah.  Thank you.
 6   information?                                6        Q.   Is that the PR firm that was
 7        A.   Right.                            7   retained?
 8        Q.   Did you discuss this preliminary  8        A.   Yeah.
 9   estimate of valuation with anyone at Parkwood 9       Q.   Did Emissary Holdings devise a
10   besides Mr. McCloskey?                     10   media strategy for Manbro relating to this
11        A.   Potentially Rob and Brad.        11   lawsuit?
12        Q.   Anyone else?                     12        A.   In conjunction with Reevemark.
13        A.   No.                              13        Q.   Do you know when Reevemark was
14        Q.   Do you recall when those         14   retained?
15   conversations occurred?                    15        A.   I don't know the specific dates,
16        A.   The investment team, I should say. 16  no.
17   I should just clarify.  I'm sure that as it 17        Q.   Would it have been before the
18   went along we discussed the valuation, but I 18   complaint in this action was filed?
19   don't know over what period.  It was the team 19      A.   Before the filing of the -- yeah.
20   in general.  But just in passing.          20   I'd have to look at the agreement.  I'm not
21        Q.   Do you recall when those         21   certain when.  I'm assuming it was somewhere
22   conversations occurred?                    22   around that time.  I think before.  I'd have
23        A.   2019, 2020.                      23   to look at the contract with Reevemark.
24        Q.   Has Emissary Holdings provided   24        Q.   Who at Emissary Holdings was
25   Manbro any services relating to the media? 25   involved in the media strategy creation?
```

```
                                              Page 310                                                Page 311
 1         J. Cary - Confidential                       1         J. Cary - Confidential
 2   India could have changed it, edited it,            2      Q.   The goal was to raise awareness of
 3   modified it after that, correct?                   3   the lawsuit in India?
 4         MR. MCDONALD:  Objection.                    4      A.   I'm sorry.  I will answer your
 5      A.   I have not compared them, yes.             5   question in just a second.  I've got to go.
 6         (Off-the-record discussion held.)            6         MR. MCDONALD:  Do you want to go
 7   BY MR. CHERRY:                                     7      off the record, Counsel?
 8      Q.   Do you know if a fully drafted             8         MR. CHERRY:  Let's go off the
 9   article was provided to Telegraph India?           9      record.
10      A.   I don't know if a fully drafted           10         THE VIDEOGRAPHER:  Going off the
11   article was provided to Telegraph India.          11      record at 4:18 p.m.
12      Q.   But the article was provided by           12         (Recess taken.)
13   Reevemark to Telegraph India, correct?            13         THE VIDEOGRAPHER:  We're back on
14         MR. MCDONALD:  Objection.                   14      the record at 4:19 p.m.  This marks the
15      A.   I understand.  I didn't know if you       15      beginning of media 6.
16   meant the full draft of this article.  So         16   BY MR. CHERRY:
17   like I said, I haven't compared the two side      17      Q.   Mr. Cary, I'll return to the last
18   by side.  I don't know if anything was            18   question asked:  The goal of this article was
19   changed or added.                                 19   to raise awareness of the lawsuit in India?
20   BY MR. CHERRY:                                    20      A.   Yeah.
21      Q.   Was the goal of this article to           21      Q.   Why did Manbro view it as important
22   create negative publicity around                  22   to raise awareness of the lawsuit in India?
23   Dr. Chatterjee related to filing of the           23      A.   To encourage settlement.
24   lawsuit?                                          24      Q.   How would awareness of the lawsuit
25      A.   No.  It was to raise awareness.           25   encourage settlement?

                                              Page 312                                                Page 313
 1         J. Cary - Confidential                       1         J. Cary - Confidential
 2      A.   So if they were more aware that we         2   BY MR. CHERRY:
 3   were pursuing this, they would be more likely      3      Q.   Did you understand that this
 4   to reach out to Dr. Chatterjee.                    4   article would result in negative publicity in
 5      Q.   Did you believe that Dr. Chatterjee        5   India for Dr. Chatterjee?
 6   wasn't aware of the lawsuit before the             6      A.   I didn't, actually.  Negative or
 7   article was published?                             7   positive -- I don't know if it was negative
 8         MR. MCDONALD:  Objection.                    8   or positive.  We were just hoping to
 9      A.   I believe he was moderately aware.         9   encourage settlement.
10   He was somewhat aware, but he wasn't tuned in     10      Q.   And your only goal in encouraging
11   to it.                                            11   settlement was to make Dr. Chatterjee aware
12   BY MR. CHERRY:                                    12   of this lawsuit?
13      Q.   You thought that the filing of this      13      A.   Make him aware, yes.  More aware.
14   article would make Dr. Chatterjee take the       14      Q.   Why did you believe he wasn't aware
15   lawsuit more seriously?                          15   before the filing of this article?
16      A.   That was potentially the hope, but      16         MR. MCDONALD:  Objection.  It's
17   ultimately the goal is settlement, to           17      been asked and answered.
18   encourage a sitdown to negotiate a mutually     18         MR. CHERRY:  It has not been asked
19   beneficial outcome.                             19      and answered.
20      Q.   And how would this article            20   BY MR. CHERRY:
21   encourage Dr. Chatterjee to settle the case?  21      Q.   Please go ahead, Mr. Cary.
22         MR. MCDONALD:  Objection.               22         MR. MCDONALD:  It has been asked
23      A.   He would see it and wonder what it    23      and answered.  You didn't like the
24   was, take more interest in the transaction,   24      answer.  That doesn't mean you get to
25   and potentially reach out.                    25      ask it again.
```

```
                                          Page 314                                               Page 315
 1         J. Cary - Confidential                       1         J. Cary - Confidential
 2         MR. CHERRY:  Mr. McDonald, I asked           2   that he wasn't sufficiently aware of the
 3      a different question this time.  I'm            3   lawsuit?
 4      asking why he believes Mr. Chatterjee           4         A.   So we hadn't settled and there
 5      was not aware.  That has not been asked         5   didn't appear to be any willingness to even
 6      before.  You can check the transcript.          6   sit down and settle.  There had been little
 7   BY MR. CHERRY:                                     7   communication.  They hadn't provided
 8      Q.   Mr. Cary, please answer.                   8   financials.  They were generally
 9         MR. MCDONALD:  It has been                   9   unresponsive.
10      answered.                                      10      Q.   And so you wanted to file this
11         Mr. Cary, don't feel like you need          11   article to exert pressure on Dr. Chatterjee?
12      to change your answer because Mr. Cherry       12      A.   I wanted to raise awareness, yes.
13      asked the same question again.                 13      Q.   Your goal was that if
14      A.   Why did I think he wasn't aware?          14   Dr. Chatterjee saw there were these
15   Was that your question?  Because we hadn't        15   publications in his home country, he would be
16   settled.                                          16   more inclined to settle with you?
17   BY MR. CHERRY:                                    17      A.   He would be more aware and
18      Q.   Was it your understanding that            18   potentially more inclined, yes.
19   Dr. Chatterjee would only be aware of the         19      Q.   Did Manbro -- does Manbro or
20   lawsuit when he had settled the lawsuit?          20   Parkwood have any employees or officers in
21      A.   No.  I think he would be more aware       21   India?
22   with this article so that we could                22      A.   Not to the best of my knowledge.
23   potentially settle.                               23      Q.   Was Reevemark's decision to reach
24      Q.   What about his conduct before             24   out to Telegraph India authorized by
25   publication of this article made you believe      25   Parkwood?

                                          Page 316                                               Page 317
 1         J. Cary - Confidential                       1         J. Cary - Confidential
 2      A.   Parkwood authorized them, I                2   form and not communicated verbally?
 3   believe, to create a publication to raise          3         MR. MCDONALD:  Objection.
 4   awareness.  I don't know that Telemark India       4      A.   I can't know that.  How would I
 5   was specifically on the list.  It may have         5   know that?
 6   been or -- if there was an official list of        6   BY MR. CHERRY:
 7   publications that they were reaching out to.       7      Q.   You mentioned earlier a potential
 8      Q.   Have you ever seen a communication,        8   list of publications.  Was there a list of
 9   a written communication, between                   9   publications that was being discussed to
10   Emissary Holdings, Reevemark, or Parkwood and     10   advance the media strategy in this case?
11   Telegraph India?                                  11      A.   We verbally discussed some.  That's
12      A.   No.                                       12   what I recall, but I don't recall which
13      Q.   Do you understand that Reevemark          13   specific media outlets we discussed.
14   would have communicated with Telegraph India      14      Q.   Do you recall if any other outlets
15   via email?                                        15   were approached by Reevemark or
16      A.   I don't.                                  16   Emissary Holdings?
17      Q.   Do you know how --                        17      A.   I don't know what other outlets
18      A.   I don't know how they communicated.       18   were approached by Reevemark.  I don't
19      Q.   I'm sorry.  Do you know how --            19   believe that Emissary Holdings ever
20      A.   I don't know how they communicated.       20   approached any of them, but that's the best
21      Q.   Do you know how Reevemark passed          21   of my knowledge.
22   along the article it drafted to Telegraph         22      Q.   You know Reevemark approached
23   India?                                            23   Telegraph India, correct?
24      A.   I do not.                                 24      A.   Yes.
25      Q.   Fair to say that it was in written        25      Q.   Do you know if any other
```

```
                                            Page 358
 1           J. Cary - Confidential
 2      Q.   What about the investment in
 3   ▇▇▇▇▇▇▇▇▇▇▇
 4      A.   Me.
 5      Q.   And the investment in ▇▇▇▇▇▇▇
 6      A.   Me.
 7           Are you asking me to search for
 8   these investments and tell you about them?
 9      Q.   No, Mr. Cary.  I'm just asking you
10   who would be the best person to ask about
11   these investments at Parkwood.
12      A.   I am the primary contact for all
13   hedge fund-related investments.
14      Q.   And the same is true for ▇▇▇▇▇▇
15   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
16   ▇▇▇▇▇▇▇▇▇▇
17      A.   I would assume so, yes.
18      Q.   But sitting here today, without
19   having done that independent research, you
20   don't have further information about those
21   investments, correct?
22      A.   That's correct.  I would have to
23   look them up.
24      Q.   Earlier, Mr. Cary, you mentioned
25   efforts by an investigative firm to track
```

```
                                            Page 359
 1           J. Cary - Confidential
 2   down the list of limited partners in the
 3   Winston funds.
 4           Do you recall that?
 5      A.   I do.
 6      Q.   Do you know if your investigative
 7   firm was ever successful in tracking down
 8   that list?
 9      A.   They were not.
10           MR. CHERRY:  Nothing further from
11   us.
12           MR. MCDONALD:  I have no questions.
13   We can go off the record.
14           THE VIDEOGRAPHER:  Are we all set,
15   Counsel?
16           MR. CHERRY:  Yes.  Thank you.
17           THE VIDEOGRAPHER:  This concludes
18   today's testimony of Joseph Cary.  We
19   are going off the record at 5:20 p.m.
20   This also concludes media 6.
21           (The deposition was concluded at
22           5:20 p.m.)
23
24
25
```

```
                                            Page 360
 1           J. Cary - Confidential
 2              C E R T I F I C A T E
 3
 4        I, ANNE E. VOSBURGH, Certified Shorthand
 5   Reporter, Registered Professional Reporter,
 6   Certified Realtime Reporter, and Closed
 7   Captioner, hereby certify:
 8        That JOSEPH CARY, via remote
 9   videoconference, solemnly affirmed and agreed to
10   testify to the truth, the whole truth and
11   nothing but the truth; that all counsel
12   stipulated to this process, notwithstanding the
13   location of reporter or witness at time of
14   deposition; and that this transcript is a true
15   and correct record of testimony given.
16        I further certify that I am not related
17   to any of the parties to this action and that I
18   am in no way interested in the outcome of this
19   matter. Dated: June 28, 2021
20              /s/ Anne E. Vosburgh
21           _____
22               ANNE E. VOSBURGH
23           Certified Shorthand Reporter No. 6804
24           Registered Professional Reporter
25           Certified Realtime Reporter
```

```
                                            Page 361
 1           J. Cary - Confidential
 2   Case Name:
 3   Deposition Date:
 4   Deponent:
 5   Pg.  No. Now Reads    Should Read    Reason
 6   ___  ___ _____   _____    _____
 7   ___  ___ _____   _____    _____
 8   ___  ___ _____   _____    _____
 9   ___  ___ _____   _____    _____
10   ___  ___ _____   _____    _____
11   ___  ___ _____   _____    _____
12   ___  ___ _____   _____    _____
13   ___  ___ _____   _____    _____
14   ___  ___ _____   _____    _____
15   ___  ___ _____   _____    _____
16   ___  ___ _____   _____    _____
17   ___  ___ _____   _____    _____
18   ___  ___ _____   _____    _____
19   ___  ___ _____   _____    _____
20
21                              _____
22                              Signature of Deponent
23   SUBSCRIBED AND SWORN BEFORE ME
24   THIS ____ DAY OF _____, 2021.
25   _____
     (Notary Public)   MY COMMISSION EXPIRES:_____
```