# Exhibit D

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF NEW YORK

 3

 4   MANBRO ENERGY CORPORATION,
     individually and on behalf of
 5   all those similarly situated,

 6              Plaintiffs,
                                        Case No.
 7      vs.                       20 Civ. 3773 (LGS)

 8   CHATTERJEE ADVISORS, LLC,
     CHATTERJEE FUND MANAGEMENT, LP,
 9   CHATTERJEE MANAGEMENT COMPANY,
     d/b/a THE CHATTERJEE GROUP, and
10   PURNENDU CHATTERJEE,

11              Defendants.
     _____
12

13

14              *** CONFIDENTIAL ***

15

16

17   VIDEOTAPED DEPOSITION OF BRADLEY S. SMITH

18           Via Remote Videoconference

19             Thursday, April 22, 2021

20

21

22

23   Stenographically Reported By:

24   Paula S. Raskin, CSR-4757

25   Job No. 192804
```

```
                                                    Page 46
 1            CONFIDENTIAL - BRADLEY S. SMITH
 2       A.    Above 25?
 3       Q.    Yes.
 4       A.    I'm sorry, could you -- you said
 5   25 grand?
 6       Q.    25 million.
 7       A.    Okay, 25 million.  Manbro would.
 8   Well, no, I don't know what would happen at that
 9   point.  We could -- we have the ability under
10   the Manbro documents to request contributions
11   from the various shareholders of Manbro.
12       Q.    So you had earlier described that
13   Manbro Energy has approximately 25 million
14   dollars in net worth.  How much of that is
15   liquid or cash?
16       A.    Probably not very much at this point.
17       Q.    Can you estimate for me how much is
18   liquid or cash?
19       A.    No, I don't -- I don't have those --
20   I don't have those numbers.
21       Q.    Do you know if it's above or lower
22   than 1 million dollars?
23       A.    I would assume that we have cash of
24   less than 1 million dollars in Manbro.  We
25   typically don't keep a lot of cash.
```

```
                                                    Page 47
 1            CONFIDENTIAL - BRADLEY S. SMITH
 2       Q.    How has Manbro Energy been financing
 3   or paying the legal fees for this lawsuit given
 4   less than 1 million dollars in cash on hand?
 5       A.    The fees are being paid as cash comes
 6   in from other sources.  It is in liquidation
 7   mode and we have the original money that they
 8   sent us.
 9       Q.    What does that mean that you have the
10   original money --
11       A.    Well, the 2.3 million dollars that
12   they tried to buy us out with.
13       Q.    So you're using the 2.3 million
14   dollar final distribution to finance part of the
15   legal fees?  Is that correct?
16       A.    Yes.
17       Q.    And how much of the 25 million
18   dollars or so in assets of Manbro Energy is in
19   illiquid, unmarketable assets?
20       A.    Most of it is in illiquid and
21   unmarketable assets.
22       Q.    How does Manbro Energy plan to
23   finance this lawsuit in the event that it cannot
24   liquidate assets?
25       A.    We will either do a capital call from
```

```
                                                    Page 48
 1            CONFIDENTIAL - BRADLEY S. SMITH
 2   the existing partners or we have lines of
 3   credit.
 4       Q.    Has anybody discussed doing capital
 5   calls from the existing partners in order to
 6   finance this litigation with the partners?
 7       A.    No.
 8       Q.    Do the partners have to provide
 9   capital calls if one is made?
10       A.    Yes.
11       Q.    Nondiscretionary?
12       A.    Nondiscretionary.
13       Q.    Who gets to decide whether to make a
14   capital call?
15       A.    Who gets to decide whether to make a
16   capital call?
17       Q.    Yes.
18       A.    It would be the board of Manbro.
19       Q.    Who's on the board of Manbro?
20       A.    I'm not sure of the exact members.
21   Myself, I think Jon McCloskey's on, Jim Fox is
22   probably on.  It's officers of Parkwood.
23       Q.    Has the board of Manbro Energy
24   discussed this lawsuit at board meetings?
25       A.    Yes.
```

```
                                                    Page 49
 1            CONFIDENTIAL - BRADLEY S. SMITH
 2       Q.    And are those board meetings -- do
 3   you keep minutes of those board meetings?
 4       A.    Not at this point, no.
 5       Q.    Okay.  So does anybody take notes of
 6   board meetings?
 7       A.    No.
 8       Q.    How many board meetings do you have a
 9   year?
10       A.    I'm not certain.  We don't
11   necessarily have formal board meetings, not in
12   the sense that you think.  It's an investment,
13   in wind-down mode.
14       Q.    When was the first time you all
15   discussed the financing of this lawsuit at a
16   board meeting?
17       A.    Financing of this lawsuit has never
18   been talked about at a board meeting.
19       Q.    Has there been a discussion with the
20   other board members, Mr. McCloskey and Mr. Fox,
21   about issuing a capital call if needed from the
22   existing partners of Manbro Energy?
23       A.    No.
24       Q.    So just so I understand, when you
25   stated that the board would issue a capital
```

```
                                                 Page 142                                                  Page 143
 1        CONFIDENTIAL - BRADLEY S. SMITH                    1        CONFIDENTIAL - BRADLEY S. SMITH
 2        A.    I believe they did.                          2        Q.    Was Emissary Holdings involved in the
 3        Q.    And what, if anything, did Emissary          3   decision to quote/unquote launch a class action
 4   Holdings do to obtain such -- attempt to obtain         4   in the Southern District of New York?
 5   such information about other affected limited           5        A.    I don't know that they were -- they
 6   partners?                                               6   weren't -- they had input, but I don't -- they
 7        A.    I do not know.                               7   were not the decision makers.
 8              MR. WEITZMAN:   Let's turn to                8        Q.    My question, though, is not whether
 9        Exhibit 84, which is Defendants'                   9   they were the decision makers, it's whether they
10        Exhibit 12.                                       10   were involved in the decision.
11              (DEFENDANTS' EXHIBIT 12 MARKED              11        A.    I believe they were in the room.
12              FOR IDENTIFICATION at 1:11 p.m.)            12        Q.    And what -- did Emissary Holdings,
13   BY MR. WEITZMAN:                                       13   were they the ones who suggested that you file
14        Q.    And this again is a printout from the       14   this as a class action?
15   Emissary Holdings website, and if you turn to          15              MR. MCDONALD:   I'll object actually
16   Page 3 at the bottom, it says "Case Studies."          16        to this question and instruct the witness
17   And then on Page 4, the final tab of this case         17        not to answer to the extent that the answer
18   study, and it says:                                    18        would reveal the contents of a conversation
19              "Outcome:   Our client was made an          19        in a room if that involves lawyers about
20        insufficient settlement offer, so opted to        20        this lawsuit, so...
21        launch a class action in the Southern             21              MR. WEITZMAN:   Are you instructing
22        District of New York.   Emissary continues        22        him not to answer?
23        to advise them on that."                          23              MR. MCDONALD:   Yes, so I'm
24              Did I read that correctly?                  24        instructing him not to answer that
25        A.    Yes.                                        25        question.   If you can ask the question in a

                                                 Page 144                                                  Page 145
 1        CONFIDENTIAL - BRADLEY S. SMITH                    1        CONFIDENTIAL - BRADLEY S. SMITH
 2        way that doesn't call for the revelation of       2        A.    I don't believe Emissary made any
 3        a privileged legal discussion, I'll               3   recommendations.
 4        consider it, but that question I am               4        Q.    Parkwood -- is it fair to say that
 5        instructing him not to answer.                    5   Parkwood understood that a class action would
 6   BY MR. WEITZMAN:                                       6   have greater potential financial ramifications
 7        Q.    Are you going to follow your                7   to defendants than just pursuing a single
 8   counsel's advice, Mr. Smith?                           8   lawsuit on behalf of Manbro Energy?
 9        A.    Yes.                                        9        A.    Yes.
10        Q.    Let me ask it another way then.            10        Q.    And is it fair to say that part of
11              Did Emissary Holdings suggest to you       11   the reason why Manbro decided to pursue this
12   that Parkwood and Manbro consider a class action      12   lawsuit as a class action was to impose the
13   lawsuit?                                              13   greatest threat of financial harm to defendants?
14              You may answer.                            14              MR. MCDONALD:   I object to that
15              THE WITNESS:   Mark, would you like me     15        question.
16        to answer?                                       16   BY MR. WEITZMAN:
17              MR. MCDONALD:   Yes, you can answer        17        Q.    You may answer, sir.
18        that question as long as you in doing so do      18        A.    Obviously.
19        not reveal the contents of any                   19        Q.    And is it fair to say that Parkwood
20        communications that you had with counsel or      20   and Manbro never reached out to any of the other
21        that were made in the presence of counsel,       21   limited partner investors before asking to sue
22        in a room with counsel.                          22   on their behalf, correct?
23   BY MR. WEITZMAN:                                      23              MR. MCDONALD:   Object to the form.
24        Q.    Can you answer the question,               24        A.    Manbro or Parkwood could not reach
25   Mr. Smith?                                            25   out to the other investors because we did not
```

Page 150

CONFIDENTIAL - BRADLEY S. SMITH

A. I'm -- I'm not questioning whether Emissary requested this or whether Manbro did or what Matt did. I'm simply saying I don't have any knowledge of this.

Q. To your knowledge, did Parkwood authorize Emissary Holdings to communicate with the press on behalf of Manbro and Parkwood?

A. Yeah, I think we did.

Q. Okay. Tell me about that authorization. When --

MR. MCDONALD: Avi, can you explain to me which deposition topic this falls under because I'm not seeing it, and I really don't think that this is within the scope of the deposition that you noticed.

MR. WEITZMAN: Well, it goes to Parkwood's roles, duties, responsibilities, and authorities, first of all, and it also goes into Topic 6, the investigation, assessment, analysis, evaluation, research, due diligence, monitoring or other review of defendants performed by you or on your behalf. It goes into any number of topics that concern how this case has been

Page 151

CONFIDENTIAL - BRADLEY S. SMITH

prosecuted, and I'd just --

MR. MCDONALD: In other words, it doesn't go into any topic. So I suggest that we either move on -- you know, I reserve the right to strike all of this testimony as outside of the scope of the 30(b)(6) notice that you and we discussed and negotiated before this deposition.

It's not appropriate to then ask a bunch of questions of a 30(b)(6) witness, particularly when you insisted that this would be separate and apart from any individual witness on behalf of Mr. Smith, but --

MR. WEITZMAN: I've been very clear that my view is that this doesn't obviate an individual deposition of Mr. Smith, but it doesn't also preclude asking --

MR. MCDONALD: You don't get two depositions of the same witness, okay? That's not how it works.

MR. WEITZMAN: Mr. McDonald, can I finish?

This doesn't obviate my right to ask

Page 152

CONFIDENTIAL - BRADLEY S. SMITH

Mr. Smith questions that he may know the answers to in his personal capacity.

BY MR. WEITZMAN:

Q. So let me ask you again, sir --

MR. WEITZMAN: And I believe this is covered by a number of topics, and we can deal with that afterwards if you want to move to strike.

BY MR. WEITZMAN:

Q. When did you or Parkwood authorize Emissary Holdings to communicate with the press on your behalf?

MR. MCDONALD: Object to the form.

THE WITNESS: Am I allowed to answer?

MR. MCDONALD: You can answer that.

A. I don't know that Parkwood did do that. Parkwood may have. Jon may have said something, but I do not know.

BY MR. WEITZMAN:

Q. Did you participate in any conversation in which Jon McCloskey authorized Emissary Holdings to communicate with the press?

A. No.

Q. Okay. Was there an effort on the

Page 153

CONFIDENTIAL - BRADLEY S. SMITH

part of Manbro to broaden the press outreach regarding this lawsuit in order to put pressure on Chatterjee to settle this lawsuit?

MR. MCDONALD: Objection.

A. I'm sure there was.

BY MR. WEITZMAN:

Q. Is it fair to say that there was an effort on the part of Parkwood and Manbro to get press coverage of this lawsuit in order to cause Chatterjee some reputational harm?

MR. MCDONALD: Objection.

A. Yes.

BY MR. WEITZMAN:

Q. What is it that Emissary Holdings, to your knowledge, told the media and the press regarding Dr. Chatterjee?

A. I don't know.

MR. WEITZMAN: Let's take -- we'll move on for now. I'm reserving the right to come back to this.

BY MR. WEITZMAN:

Q. Manbro's an accredited investor, correct?

A. At the time of the investment, it

Page 206
CONFIDENTIAL - BRADLEY S. SMITH
```
 2    Q.   This is a document that Manbro kept
 3 and maintained in the -- I'm sorry, that
 4 Parkwood kept and maintained in the ordinary
 5 course, correct?
 6    A.   Yes.
 7    Q.   So if you look at the first bullet
 8 point, in 2003 it was reported to Parkwood, and
 9 it said:
10         "Overall net asset value declined
11     some 36 percent in 2002, mainly as the
12     result of marking down the telecom ventures
13     as well as the value of the aircraft, 727s
14     and A300s, to zero since the amount of debt
15     was greater than the likely resale value of
16     the aircraft.  This markdown left the
17     petrochemical plant, Haldia, some
18     80 percent of the portfolio's remaining
19     value."
20         Do you see that?
21    A.   Yes.
22    Q.   So as we just discussed, not only did
23 Manbro and Parkwood understood that these were
24 risky investments without any guarantees,
25 several of the investments actually were written
```

Page 207
CONFIDENTIAL - BRADLEY S. SMITH
```
 2 down to zero, correct?
 3    A.   Yes.
 4    Q.   And when -- what does it mean to
 5 write down an asset to zero?
 6    A.   That means that you believe that the
 7 entire value has gone away.
 8    Q.   And so a multiple of WPPE's
 9 investments had debt greater than the value of
10 the asset, right?
11    A.   I'm not familiar -- all that familiar
12 with the assets, but if that's what the memo
13 says, yes, yes, that's -- that would make sense.
14    Q.   Now, in 2003, there was an
15 understanding, sir, that the Haldia investment
16 comprised 80 percent of the remaining value of
17 WPPE, correct?
18    A.   Yes.
19    Q.   And is it fair to say that Manbro and
20 Parkwood understood that the Haldia investment
21 itself was a very risky investment?
22    A.   Yes.
23    Q.   And, in fact -- let me withdraw that.
24         I know it says the title of the
25 company's Manbro Energy.
```

Page 208
CONFIDENTIAL - BRADLEY S. SMITH
```
 2         Did Manbro have any prior history in
 3 the petrochemical industry?
 4    A.   Not of that nature, no.
 5    Q.   Did Manbro have any history of
 6 investments in India?
 7    A.   I am not certain if we had other
 8 investments in India.
 9    Q.   There was an understanding, sir, that
10 Haldia had a very large debt burden, correct, as
11 of (audio distortion)?
12         (Reporter clarification.)
13    Q.   2003 Haldia had a very large debt
14 burden, correct, sir?
15    A.   Is that what it says here?
16    Q.   You can read the second bullet point
17 to yourself.
18    A.   Okay.
19    Q.   Is that correct?  Is that Parkwood's
20 understanding in 2003?
21    A.   Yes.
22    Q.   And, in fact, the debt burden was so
23 extensive that it required a markdown of the net
24 asset value of the asset, correct?
25    A.   Yes.
```

Page 209
CONFIDENTIAL - BRADLEY S. SMITH
```
 2    Q.   And in the third bullet point, it
 3 says, quote/unquote:
 4         "Because Mr. Chatterjee has a great
 5     deal of his personal net worth in this
 6     asset, perhaps 50 percent, he has been
 7     spending 70 percent of his time in India
 8     working on restructuring the debt.
 9     Naturally the lenders are reluctant to do
10     so since they would like to gain control of
11     this asset.  Winston, with three-sevenths
12     of the equity and another group close to
13     Chatterjee with one-seventh, have been
14     working together, but it looks as though
15     Chatterjee himself will have to inject more
16     equity."
17         Did I read that correctly?
18    A.   That is what's written, yes.
19    Q.   Fair to say, sir, that Parkwood
20 understood that Chatterjee was investing a lot
21 of his own personal time and resource in an
22 effort to improve the position of Haldia, right?
23    A.   At this particular time, yes.
24    Q.   And that effort would have benefited
25 investors like you all in WPPE, right?
```

```
                                                    Page 210                                                      Page 211
 1         CONFIDENTIAL - BRADLEY S. SMITH                        1         CONFIDENTIAL - BRADLEY S. SMITH
 2             MR. MCDONALD:  Objection.                          2       A.    Yes.
 3       A.    Yes.                                               3       Q.    But Manbro and Parkwood understood,
 4   BY MR. WEITZMAN:                                             4   sir, that there was a risk that it could be
 5       Q.    And according to this paragraph,                   5   completely wiped out due to the lenders taking
 6   Parkwood was aware, sir, that the lenders were               6   over Haldia in -- as of 2003, correct?
 7   reluctant to restructure the debt, right?                    7       A.    Yes.
 8       A.    Yes.                                               8       Q.    And was there any assessment of how
 9       Q.    And one of the reasons why lenders                 9   significant that risk was to Manbro Energy and
10   are reluctant to restructure debt is because                10   Parkwood, as well as Haldia?
11   they want to take control of the asset                      11       A.    I don't believe there would have been
12   themselves, right?                                          12   an assessment of the risk.
13       A.    Yes.                                              13       Q.    Needless to say, it was communicated
14       Q.    Is it fair to say that Parkwood and               14   to Parkwood investor -- the investment committee
15   Manbro Energy understood at this time in 2003               15   and Parkwood that this was not a good investment
16   that there was a risk that the lenders would                16   for Manbro Energy, correct?
17   take control of the asset themselves?                       17       A.    Yes.
18       A.    Yes.                                              18       Q.    In the last paragraph, Mr. Ehrlich
19       Q.    And if the lenders had taken control              19   says:
20   of the asset themselves, what would that have               20             "Clearly this was not a good
21   done to Manbro Energy's investment in WPPE?                 21       investment, but the remaining stub probably
22       A.    Probably would have wiped it out.                 22       should be held since it is, A, illiquid; B,
23       Q.    So Chatterjee in 2003 was working                 23       could be sold only at a steep discount from
24   very hard, in Parkwood's knowledge, to prevent              24       present NAV; and C, that NAV probably is
25   that from happening, correct?                               25       well undervalued."

                                                    Page 212                                                      Page 213
 1         CONFIDENTIAL - BRADLEY S. SMITH                        1         CONFIDENTIAL - BRADLEY S. SMITH
 2             Do you see that?                                   2       paid partly by the Chatterjee group of
 3       A.    Yes.                                               3       funds, but Chatterjee's management company
 4       Q.    Does the fact that Harold Ehrlich                  4       is paying the bulk."
 5   said to you -- said to Parkwood that the                     5             Do you see that?
 6   investment could be sold at a steep discount                 6       A.    Yes.
 7   from present NAV, does that indicate -- does                 7       Q.    You understood that Dr. Chatterjee
 8   that refresh your recollection that in fact                  8   and his affiliated entities were personally
 9   Parkwood could have opted to sell its investment             9   paying the bulk of the interest on Haldia's
10   or withdraw its investment, redeem, from WPPE?              10   debt, not requiring those payments from WPPE and
11             MR. MCDONALD:  Objection.                         11   other funds, correct?
12       A.    That -- that statement does not                   12             MR. MCDONALD:  Objection.
13   necessarily mean that, and it certainly does not            13       A.    That is what the memo indicates, yes.
14   mean that in our context.                                   14   BY MR. WEITZMAN:
15             It is likely that Harold was thinking             15       Q.    You'd also agree with me, sir, that
16   that -- or it's possible that Harold was                    16   Dr. Chatterjee -- there was no legal requirement
17   thinking that this could have been sold to a                17   at this time for him to do all this work to save
18   secondary buyer, this could have been sold to a             18   Haldia, correct?
19   third party.  To require that would do a                    19             MR. MCDONALD:  Objection.
20   substantial discount, but this doesn't mean that            20       A.    Part of the -- it's all about who and
21   we had the right to withdraw at a discount.                 21   why do you want to invest with people who have
22   BY MR. WEITZMAN:                                            22   skin in the games is because they have a
23       Q.    If you go up to the next bullet                   23   personal interest, and so this would have been
24   point, the fourth bullet point, it says:                    24   one of the reasons that we were willing to take
25             "Interest on the Haldia debt is being             25   the risk in such an illiquid, risky investment
```

Page 214

CONFIDENTIAL - BRADLEY S. SMITH

because we knew that he would do whatever he could to benefit the company, and then we would benefit because of our investment side by side with him.

    MR. WEITZMAN:  Move to strike.

BY MR. WEITZMAN:

    Q.  I'm going to ask you again the question that I want answered, which is Dr. Chatterjee had no legal requirement to invest his time and resources, personal resources, to try to save Haldia, correct?

    MR. MCDONALD:  Objection to asking the witness for a legal conclusion.  If you're asking him what the contract says, the contract will speak for itself.

    But go ahead and answer it if you can, Mr. Smith.

    A.  I have no idea.

BY MR. WEITZMAN:

    Q.  There was nothing in the fund documents for WPPE that required Chatterjee to invest his personal assets above and beyond his investment in WPPE in an effort to improve Haldia, correct?

Page 215

CONFIDENTIAL - BRADLEY S. SMITH

    MR. MCDONALD:  Same objection.

    A.  There's nothing that I'm aware of, no.

    MR. WEITZMAN:  Okay.  Let's go to Tab 36 and mark this as Exhibit 19.

    (DEFENDANTS' EXHIBIT 19 MARKED FOR IDENTIFICATION at 2:47 p.m.)

BY MR. WEITZMAN:

    Q.  Do you recognize this document?

    A.  I do not recognize this document.

    Q.  Do you recognize this as a document that Manbro produced to the defendants?

    A.  I don't actually recognize this as a document that Manbro produced for the defendants, but I'm willing to accept that.

    MR. MCDONALD:  We'll stipulate to that.

BY MR. WEITZMAN:

    Q.  Do you recognize this as a communication from Chatterjee, Winston Partners, to Parkwood regarding the net asset value of the investment as of October 2006?

    MR. MCDONALD:  I'll just say are you referring to the first page?  Because it's

Page 216

CONFIDENTIAL - BRADLEY S. SMITH

a multi-page document, at least in my binder.

    MR. WEITZMAN:  I am referring to the first page.

    A.  Yes.

    (Off the written record.)

BY MR. WEITZMAN:

    Q.  So this is a collection, sir, of net asset value disclosures dated from 2006 through 2017, correct?  You can scan through the pages.

    A.  Yes.

    Q.  And each of these was kept and maintained by Manbro in the normal course, correct?

    A.  Yes.

    Q.  In the second paragraph on the first page, it states that:

    "The unaudited net asset value of your investments, after accrual of your distribution management fees and expenses, is as follows."

    Do you see that?

    A.  Yes.

    Q.  And, in fact, on each one of these

Page 217

CONFIDENTIAL - BRADLEY S. SMITH

pages it references an unaudited net asset value of the investment.  Do you see that?

    A.  Yes.

    Q.  So between 2006 and 2017, Chatterjee disclosed to Parkwood every year at least that there was an unaudited net asset value for the investment, correct?

    MR. MCDONALD:  Objection.

    A.  Yes.

BY MR. WEITZMAN:

    Q.  And what did it mean to you or to Parkwood that the net asset value -- these net asset value reports were unaudited?

    A.  We would have preferred audited, but the unaudited net asset value wouldn't have mattered that much.

    Q.  At any point in time prior to 2017, so between 2006 and 2017, did Parkwood or Manbro ever dispute the calculation of net asset value with defendants?

    A.  No.

    Q.  At any time between 2006 and 2017, did Parkwood or Manbro ever tell defendants that they believed the net asset value calculation

Page 326

CONFIDENTIAL - BRADLEY S. SMITH

1  Parkwood and Manbro regarding whether to sign
2  this release?
3      A.  There were discussions between
4  Parkwood and Manbro on whether to sign this
5  release.
6      Q.  And what was the reason why Manbro
7  decided not to sign this release?  Without
8  revealing any privileged legal advice, what was
9  the reason?
10     A.  We did not have adequate comfort with
11 the valuation.
12     Q.  When you say the valuation, are you
13 referring to the valuation of WPPE --
14     A.  The valuation of the Haldia shares.
15     Q.  Did Manbro receive advice from
16 outside counsel regarding this release at any
17 point in time prior to -- in or about 2017 I
18 mean?
19     A.  I don't remember.
20     Q.  Okay.  It states here in the release:
21         "I" -- and then there's a blank -- "a
22     partner in Winston Partners Private Equity
23     LLC hereby confirm that following my return
24     of this acknowledgement in payment of the

Page 327

CONFIDENTIAL - BRADLEY S. SMITH

1  amount represented in the funds March 31,
2  2017 NAV statement, neither the fund nor
3  the investor shall hold any claims past,
4  present, or future against the other."
5      Who did you understand -- who did
6  Manbro understand the fund to refer to?
7      MR. MCDONALD:  Objection to the
8      extent that that calls for privileged
9      advice or privileged communications.  Do
10     you want to put a time frame on that, Avi?
11 BY MR. WEITZMAN:
12     Q.  In May of 2017, who did Manbro
13 understand the fund to refer to?
14     MR. MCDONALD:  Objection.
15     You can answer.
16     A.  Manbro wouldn't have -- Manbro would
17 have in some sense thought that it was the
18 entire Chatterjee Group; that this wasn't just
19 one particular fund, but this is -- yeah.
20 BY MR. WEITZMAN:
21     Q.  And is it fair to say that Parkwood
22 was concerned that this release would release
23 the entire Chatterjee Group and therefore did
24 not sign the release?

Page 328

CONFIDENTIAL - BRADLEY S. SMITH

1      A.  No.  Parkwood did not sign the
2  release because we weren't comfortable with the
3  valuation.  We didn't know how the shares were
4  valued.  A release from an investment manager is
5  not a normal request.  We get distributions all
6  the time without such a release request.
7      Q.  Are you aware -- this release would
8  have been two-directional; the fund would
9  release any claims against the investor and
10 vice-versa, correct?
11     A.  Yes.
12     Q.  Fair to say that the -- one of the
13 concerns that Manbro and Parkwood had was they
14 wanted to preserve their ability to sue
15 Dr. Chatterjee and the fund advisor?
16     MR. MCDONALD:  Objection.
17     You can answer.
18     A.  At this particular point in time, we
19 were not thinking about any of that.  At this
20 particular point in time, we were just looking
21 for some type of comfort on the valuation, how
22 was this price determined.  That was all we were
23 looking for.
24 BY MR. WEITZMAN:

Page 329

CONFIDENTIAL - BRADLEY S. SMITH

1      Q.  I understand that.  What I'm trying
2  to figure out is what did you understand this
3  release to be requesting?  I'm not asking why.
4      What did Parkwood understand -- you
5  as the designee, who did you -- let me just
6  finish.  Who did you -- sorry.
7      Who did you -- as Parkwood's
8  designee, who did Parkwood believe that this
9  release would extend to?
10     MR. MCDONALD:  I object to that
11     question unless it's framed as before any
12     advice or discussions with outside counsel.
13     MR. WEITZMAN:  It is.
14 BY MR. WEITZMAN:
15     Q.  In May -- let me rephrase again.  Let
16 me be very clear.
17     Without revealing the substance of
18 any legal advice, in May 2017 when Parkwood
19 received this requested release, who did it
20 understand the release was requested to extend
21 to?
22     A.  I'm still -- I'm not following your
23 question.
24     Q.  Without revealing the substance of

```
                                                                    Page 346
 1              CONFIDENTIAL - BRADLEY S. SMITH
 2   action?
 3        A.   Yes.
 4        Q.   Why?
 5        A.   Because we feel like to some extent
 6   that the other shareholders were treated
 7   unfairly and that they should have a right to
 8   the full facts.
 9        Q.   Does Manbro realize it -- does
10   Manbro -- I'm sorry.
11             Does Manbro understand what its
12   responsibilities are in connection with serving
13   as class representative?
14        A.   Yes.
15             MR. MCDONALD:  I'll object to that.
16        You're getting into a probably privileged
17        area, Counsel.  If there's a question that
18        you want to ask, more targeted perhaps,
19        that would help.
20   BY MR. WEITZMAN:
21        Q.   What, if anything, is Manbro doing
22   different from Parkwood?  What is Manbro doing
23   to supervise counsel and supervise this
24   litigation?
25             MR. MCDONALD:  I'll object to that.
```

```
                                                                    Page 347
 1              CONFIDENTIAL - BRADLEY S. SMITH
 2             You can answer.
 3        A.   I'm not sure Manbro's doing anything.
 4   BY MR. WEITZMAN:
 5        Q.   Has Parkwood ever been a defendant in
 6   a lawsuit?
 7        A.   Not that I'm aware of.
 8        Q.   Are you aware of that lawsuit in 2019
 9   in West Palm Beach filed by Sea Breeze Building
10   against Parkwood Trust Company?
11        A.   That was a lawsuit against a trust, a
12   Parkwood Trust Company.  It really wasn't a
13   lawsuit against Parkwood.  It was a lawsuit
14   against the trust.
15        Q.   What was -- sorry, I didn't mean to
16   cut you off.  Go ahead.
17        A.   The -- we have a lot of generation
18   exempt trusts.  The particular trust in question
19   was holding the real estate that was to be
20   purchased and built by the beneficiary.  The
21   beneficiary had a dispute with his builder as to
22   the quality of the workmanship.
23             Because we were trustee of the trust,
24   we got brought into the dispute hoping that the
25   beneficiary would cave because he didn't want
```

```
                                                                    Page 348
 1              CONFIDENTIAL - BRADLEY S. SMITH
 2   his trustee to be sued.
 3        Q.   And has that case been resolved?
 4        A.   The case has been resolved.
 5        Q.   Were you involved in supervising that
 6   case?
 7        A.   I was involved and at some high
 8   level, yes.
 9        Q.   Were you -- was anybody from Parkwood
10   Trust deposed in that case?
11        A.   No.
12        Q.   Have there ever been any civil
13   enforcement actions or civil investigations or
14   criminal investigations, for that matter, of
15   anybody at Manbro?
16        A.   No.  I don't think there has been any
17   of that against anybody at Parkwood.
18        Q.   Have Manbro, Parkwood, or any of
19   their employees ever been subject to any
20   sanction by a court in any legal action?
21        A.   Not that I'm aware of.
22        Q.   Were there any SEC investigations of
23   Manbro or its principals at any point in time,
24   to your knowledge?
25        A.   No.
```

```
                                                                    Page 349
 1              CONFIDENTIAL - BRADLEY S. SMITH
 2        Q.   Has Manbro ever sought litigation
 3   funding from a third party to finance this
 4   lawsuit?
 5        A.   No.
 6        Q.   Did Manbro ever consider seeking
 7   litigation funding to finance this lawsuit?
 8        A.   No.
 9        Q.   Did Manbro ever consider -- let me
10   rephrase that.
11             Did Parkwood ever seek litigation
12   funding to finance this lawsuit from a third
13   party?
14        A.   No.
15        Q.   And did Parkwood ever consider
16   selling off all or part of its claim to a third
17   party?
18        A.   No.
19        Q.   Are you familiar with the entity
20   called Contrarian Capital?
21        A.   I believe they are one of our
22   managers or were at one time.
23        Q.   And was there any discussion, to your
24   knowledge, with Contrarian Capital regarding
25   financing the lawsuit or selling a portion of
```

```
                                                    Page 358                                                           Page 359
 1         CONFIDENTIAL - BRADLEY S. SMITH                          1         CONFIDENTIAL - BRADLEY S. SMITH
 2              C E R T I F I C A T E                               2              E X A M I N A T I O N S
 3                                                                  3
 4    STATE OF MICHIGAN    )                                        4    WITNESS                                          PAGE
 5                         ) ss.:                                   5    BRADLEY S. SMITH
 6    COUNTY OF OAKLAND    )                                        6    EXAMINATION BY MR. WEITZMAN:                        6
 7                                                                  7
 8         I, Paula S. Raskin, a Notary Public                      8
 9    within and for the State of Michigan, do                      9              E X H I B I T S
10    hereby certify:                                              10
11         That BRADLEY S. SMITH, the witness                      11    NUMBER            DESCRIPTION                     PAGE
12    whose deposition is hereinbefore set forth,                  12    EXHIBIT 1     TAB 3                                 11
13    was duly sworn by me and that such                           13    EXHIBIT 2     TAB 4                                 12
14    deposition is a true record of the                           14    EXHIBIT 3     TAB 78                                15
15    testimony given by such witness.                             15    EXHIBIT 4     TAB 5                                 33
16         I further certify that I am not                         16    EXHIBIT 5     TAB 87                                58
17    related to any of the parties to this                        17    EXHIBIT 6     TAB 91                                58
18    action by blood or marriage; and that I am                   18    EXHIBIT 7     TAB 8                                 65
19    in no way interested in the outcome of this                  19    EXHIBIT 8     TAB 10                               106
20    matter.                                                      20    EXHIBIT 9     TAB 81                               126
21         IN WITNESS WHEREOF, I have hereunto                     21    EXHIBIT 10    TAB 82                               129
22    set my hand April 23, 2021.                                  22    EXHIBIT 11    TAB 83                               135
23           [signature]                                           23    EXHIBIT 12    TAB 84                               142
24    ---------------------------                                  24    EXHIBIT 13    TAB 85                               148
25              Paula S. Raskin                                    25    EXHIBIT 14    TAB 6                                159

                                                    Page 360                                                           Page 361
 1         CONFIDENTIAL - BRADLEY S. SMITH                          1                   ERRATA SHEET
 2    EXHIBIT 15    TAB 29                         175              2    Case Name:
 3    EXHIBIT 16    TAB 30                         187              3    Deposition Date:
 4    EXHIBIT 17    TAB 33                         197              4    Deponent:
 5    EXHIBIT 18    TAB 31                         205              5    Pg.  No.  Now Reads      Should Read   Reason
 6    EXHIBIT 19    TAB 36                         215              6    ___  ___  _____     _____    _____
 7    EXHIBIT 20    TAB 73                         220              7    ___  ___  _____     _____    _____
 8    EXHIBIT 21    TAB 74                         221              8    ___  ___  _____     _____    _____
 9    EXHIBIT 22    TAB 75                         221              9    ___  ___  _____     _____    _____
10    EXHIBIT 23    TAB 76                         221             10    ___  ___  _____     _____    _____
11    EXHIBIT 24    TAB 88                         246             11    ___  ___  _____     _____    _____
12    EXHIBIT 25    TAB 51                         251             12    ___  ___  _____     _____    _____
13    EXHIBIT 26    TAB 53                         266             13    ___  ___  _____     _____    _____
14    EXHIBIT 27    TAB 54                         284             14    ___  ___  _____     _____    _____
15    EXHIBIT 28    TAB 56                         311             15    ___  ___  _____     _____    _____
16    EXHIBIT 29    TAB 34                         318             16    ___  ___  _____     _____    _____
17    EXHIBIT 30    TAB 89                         322             17    ___  ___  _____     _____    _____
18    EXHIBIT 31    TAB 67                         324             18    ___  ___  _____     _____    _____
19    EXHIBIT 32    TAB 58                         332             19    ___  ___  _____     _____    _____
20    EXHIBIT 33    TAB 59                         335             20
21    EXHIBIT 34    TAB 90                         341                                               _____
22                                                                 21                               Signature of Deponent
23       (Exhibits attached to transcript.)                        22    SUBSCRIBED AND SWORN BEFORE ME
24                                                                 23    THIS ____ DAY OF _____, 2021.
25                                                                 24    _____
                                                                   25    (Notary Public)   MY COMMISSION EXPIRES:_____
```