CLEARY GOTTLIEB STEEN & HAMILTON LLP

One Liberty Plaza
New York, NY 10006-1470
T: +1 212 225 2000
F: +1 212 225 3999

clearygottlieb.com

AMERICAS
NEW YORK
SAN FRANCISCO
SÃO PAULO
SILICON VALLEY
WASHINGTON, D.C.

ASIA
BEIJING
HONG KONG
SEOUL

EUROPE & MIDDLE EAST
ABU DHABI
BRUSSELS
COLOGNE
FRANKFURT
LONDON
MILAN
PARIS
ROME

CRAIG B. BROD
RICHARD J. COOPER
JEFFREY S. LEWIS
PAUL J. SHIM
STEVEN L. WILNER
DAVID C. LOPEZ
MICHAEL A. GERSTENZANG
LEV L. DASSIN
DAVID H. BOTTER
JORGE U. JUANTORENA
MICHAEL D. WEINBERGER
DAVID LEINWAND
JEFFREY A. ROSENTHAL
MICHAEL D. DAYAN
CARMINE D. BOCCUZZI, JR.
JEFFREY D. KARPF
FRANCISCO L. CESTERO
FRANCESCA L. ODELL
WILLIAM L. MCRAE
JASON FACTOR
JOON H. KIM
ALAN M. LEVINE
MARGARET S. PEPONIS
LISA M. SCHWEITZER
JUAN G. GIRÁLDEZ
DUANE MCLAUGHLIN
CHANTAL E. KORDULA
BENET J. O'REILLY
ADAM E. FLEISHER
SEAN A. O'NEAL
GLENN P. MCGRORY
DEBORAH NORTH
MATTHEW P. SALERNO
MICHAEL J. ALBANO
VICTOR L. HOU
ROGER A. COOPER
LILLIAN TSU
AMY R. SHAPIRO
JENNIFER KENNEDY PARK
ELIZABETH LENAS
LUKE A. BAREFOOT
JONATHAN S. KOLODNER
DANIEL ILAN
MEYER H. FEDIDA
ADRIAN R. LEIPSIC
ELIZABETH VICENS
ADAM J. BRENNEMAN
ARI D. MACKINNON
JAMES E. LANGSTON
JARED GERBER
RISHI ZUTSHI
JANE VANLARE
AUDRY X. CASUSOL
ELIZABETH DYER
DAVID H. HERRINGTON
KIMBERLY R. SPOERRI
AARON J. MEYERS
DANIEL C. REYNOLDS
ABENA A. MAINOO
HUGH C. CONROY, JR.
JOHN A. KUPIEC
JOSEPH LANZKRON
MAURICE R. GINDI
KATHERINE R. REAVES
RAHUL MUKHI
ELANA S. BRONSON
MANUEL SILVA
KYLE A. HARRIS
LINA BENSMAN
ARON M. ZUCKERMAN
KENNETH S. BLAZEJEWSKI
MARK E. MCDONALD
F. JAMAL FULTON
PAUL V. IMPERATORE
CLAYTON SIMMONS
CHARLES W. ALLEN
JULIA L. PETTY
HELENA K. GRANNIS
SUSANNA E. PARKER
THOMAS S. KESSLER
RESIDENT PARTNERS

JUDITH KASSEL
PENELOPE L. CHRISTOPHOROU
BOAZ S. MORAG
HEIDE H. ILGENFRITZ
ANDREW WEAVER
JOHN V. HARRISON
MATTHEW BRIGHAM
EMILIO MINVIELLE
LAURA BAGARELLA
JONATHAN D.W. GIFFORD
DAVID W.S. YUDIN
KARA A. HAILEY
ANNA KOGAN
BRANDON M. HAMMER
BRIAN J. MORRIS
CARINA S. WALLANCE
ALEXANDER JANGHORBANI
RESIDENT COUNSEL

D: +1 212 225 2333
memcdonald@cgsh.com

July 4, 2023

<u>VIA ECF</u>
The Honorable Lorna G. Schofield
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: *Manbro Energy Corp. v. Chatterjee Advisors, LLC, et al.*, No. 20-cv-3773 (LGS)

Dear Judge Schofield:

The parties write jointly to raise a dispute regarding the admissibility of opinion testimony from Defendants' expert Fabio Savoldelli during the liability phase of trial.

1. **<u>Plaintiff's Position</u>**

**<u>Admissibility of Mr. Savoldelli's Opinion Testimony in Liability Phase</u>**

Plaintiff Manbro Energy Corporation respectfully requests that the Court clarify that Defendants' expert Fabio Savoldelli is excluded from the liability phase along with the other experts.

At the June 27, 2023 pre-trial conference, at Defendants' request, the Court excluded both sides' damages experts from the liability phase. June 27, 2023 Conf. Tr. at 42:5-7. Manbro initially understood this order to encompass *both* of Defendants' experts, given that both opine on matters relating to damages. However, because Defendants chose not to confirm during the conference that they could still call Mr. Savoldelli in the liability phase, Plaintiff realized that it was possible Defendants disagreed with Plaintiff's understanding. Accordingly, on June 29, Plaintiff reached out to Defendants to confirm they did not intend to call Mr. Savoldelli to testify in the liability phase. Defendants did not respond until Plaintiff asked again on an unrelated July 1 meet and confer, during which Defendants finally revealed that they *do* intend to call Mr.

Savoldelli to testify in the liability phase, notwithstanding the Court's ruling on damages experts—and notwithstanding, as Defendants acknowledged, that Dr. Schoar (who Defendants succeeded in having excluded from the liability phase) rebuts the few opinions Mr. Savoldelli offers in this case that have not already been excluded. Plaintiff is thus compelled to raise this issue with the Court.

As an initial matter, most of Mr. Savoldelli's opinions have already been excluded by the Court's rulings on Manbro's motions *in limine*:

- *First*, Mr. Savoldelli's opinion that "Manbro's investment in the Funds should be evaluated as a whole across the entire portfolio, not in isolation looking solely at the returns for a particular underlying asset of the Funds," Savoldelli Op. Rep. ¶ 17,[1] is precluded by the Court's ruling on Plaintiff's MIL No. 3. *See* ECF No. 316 at 9 (precluding evidence of returns on other investments).
- *Second*, Mr. Savoldelli's opinion that, "starting in 2009, CMC did not charge the Funds any management fees for [Defendants'] significant efforts [in managing HPL], which could have cost Manbro a substantial amount of money," Savoldelli Op. Rep. ¶ 19, is precluded by the Court's ruling on Plaintiff's MIL No. 4. *See* ECF No. 316 at 10 (excluding evidence and argument regarding Defendants' waiver of management fees).
- *Third*, Mr. Savoldelli's opinion that, "[w]ith the exception of Manbro, all other Fund investors accepted the Final Distribution at NAV, further confirming that it was consistent with industry practice," Savoldelli Op. Rep. ¶ 20, is precluded by the Court's ruling on Plaintiff's MIL No. 5. *See* ECF No. 316 at 10 (excluding evidence and argument regarding other investors' responses to the Final Distribution).
- *Fourth*, Mr. Savoldelli's opinion on Defendants' alleged inability to sell WPPE's stake in Haldia based on the purported Non-Disposal Undertaking ("NDU"), Savoldelli Op. Rep. ¶ 115; Savoldelli Rebut. Rep. ¶ 5, is precluded by the Court's ruling on Plaintiff's MIL No. 7. *See* ECF No. 316 at 11-12 ("expert testimony predicated on the assumption that the NDU was executed is unreliable").

What's left of Mr. Savoldelli's opinions has no bearing on Defendants' liability, and so should be excluded as well. For example, Mr. Savoldelli opines that various decisions made by Defendants years before the Final Distribution were "consistent with industry custom and practice," including "the separation of HPL and other non-marketable assets of WPII into WPPE"—which occurred *in 1998*—and the "20-year life of the HPL investment." Savoldelli Op. Rep. ¶¶ 16, 18, 69. Mr. Savoldelli also opines that, "consistent with their economic incentives (which were aligned with those of the Funds' investors), Dr. Chatterjee and TCG exerted significant effort in managing HPL." Savoldelli Op. Rep. ¶ 19. These opinions are irrelevant to Manbro's claims, which depend on whether Defendants acted in bad faith by cashing out their investors at the time and in the manner that they did—not on whether Defendants' *earlier* conduct was "consistent with industry custom and practice." *See* Savoldelli Op. Rep. ¶ 69. At best, Mr. Savoldelli's testimony would amount to a confusing sideshow and

[1] *See also* ¶¶ 78-83 (opining that "Manbro's Return [on its overall investment in WPII and WPPE] Exceeded Industry Benchmarks").

waste of time; at worst, Mr. Savoldelli's testimony could lead the jury to improperly excuse Defendants' bad faith conduct in connection with the Final Distribution on the basis that Defendants behaved "consistent[ly] with industry custom and practice" in other instances. Savoldelli Op. Rep. ¶ 69; *see also* Fed. R. Evid. 404(a)(1) (prohibiting character evidence to prove someone acted in conformity with character on a particular occasion); *Boyce v. Weber*, No. 19-CV-3825 (JMF), 2021 WL 2821154, at *8 (S.D.N.Y. July 7, 2021) (excluding evidence that defendant did not engage in misconduct on prior occasions as "inadmissible propensity evidence").

Mr. Savoldelli does assert in his report that "[t]he Final Distribution, in combination with the offer to distribute HPL shares in kind, was consistent with industry custom and practice." Savoldelli Op. Rep. ¶ 20. While, in theory, expert testimony that the Final Distribution was consistent with "industry custom and practice" could be relevant in the liability phase (so long as it did not stray across the line into giving an ultimate conclusion), here, Mr. Savoldelli conceded he is offering no such opinion. Specifically, he does *not* opine that the Final Distribution, as initially announced by Defendants on May 17, 2017 (in which investors received cash in the amount of their NAV with no option to receive shares, which Mr. Savoldelli referred to as a "portfolio manager buyout") was consistent with industry custom and practice. *See* Savoldelli Dep. Tr. 55:23-56:5 ("Q. I may have missed it, but in either of your reports, do you talk about what the industry custom and practice is for portfolio manager buyouts? A. . . . I talk about the various payment methods. But, no, I don't believe I specifically have a paragraph on portfolio manager buyouts, no.").[2] And while he opines that it would be consistent with industry custom and practice for a fund manager to make a distribution of shares, he conceded that is not what happened here (and that the purported in-kind offers were only made to Manbro later in attempt to resolve a dispute). *Id.* at 178:14-20 ("Q. Is there anything in [the Final Distribution letter] that talks about an in-kind distribution or an option to have an in-kind distribution? A. No. That, I believe, occurred later during the long effort, I gather, to resolve this difference of opinion."). Mr. Savoldelli nowhere expressed an opinion that this scenario—where the fund manager announces a portfolio manager buyout and then, when an investor objects because the price is too low, offers to distribute illiquid shares instead—is consistent with industry custom and practice. He just gives his *ipse dixit* that he thinks it was a "fair resolution." *Id.* at 173:11-174:2 ("[A]re you giving an opinion that the final distribution, the cash distribution, was consistent with industry custom and practice? A. The final distribution was consistent with the – with the fund documents. . . . And when you *combine* the [final distribution with the subsequent "offers" of a payment in kind], this is . . . a fair resolution that takes the question of valuation out of the picture.") (emphasis added).

In other words, Mr. Savoldelli's opinion is only that Defendants' purported offers of an in-kind distribution "would have provided the fair value of Manbro's holdings more precisely than any cash distribution based on an analytical valuation." Savoldelli Op. Rep. ¶ 20. While

[2] Indeed, when asked whether it was consistent with industry custom and practice to pay investors their initial cost when the value of the investment was worth more, Mr. Savoldelli repeatedly characterized that as "stealing." *See, e.g.,* Savoldelli Dep. Tr. 69:8-13 ("You – you can't steal from your investors, I guess, Mr. McDonald. You know, in other words, if you know [with certainty] that it's worth 500 and you buy it for 2, you are, without a doubt, in breach of your duties as a manager."); 132:3-133:10 ("If [an investment manager] would have a good-faith basis to believe that he's [buying assets from his investors] at a substantially lower price [than the assets are worth] . . . then he would absolutely be doing something wrong[.]").

Plaintiff will show that is wrong, it is, at most, relevant to Defendants' mitigation defense and should therefore be cabined to the damages phase of trial. *See* ECF No. 317 at 9. This opinion testimony has nothing to do with liability and should be excluded from the liability phase.[3] Even if Mr. Savoldelli's opinions were admissible in the liability phase, Dr. Schoar directly rebuts these opinions in her expert reports. For example, Dr. Schoar explains, in response to Mr. Savoldelli's opening report, that an in-kind distribution "would likely have failed to provide investors the fair value of the shares," and that Defendants failed to provide Manbro with financial information "which would have allowed Manbro to perform the due diligence that is indispensable for making investments in a privately held company." Schoar Rebut. Rep. ¶¶ 40-41. Additionally, Dr. Schoar has explained that purported restrictions on Haldia shares, such as the NDU (which has been excluded) and the pledge (which has not), would not have prevented Defendants from selling WPPE's interest in Haldia. *See* Schoar Op. Rep. ¶¶ 158-162, 164; Schoar Rebut. Rep. ¶¶ 13-17 (responding to similar arguments from Brown Opening Report); Schoar Sur. Rep. ¶¶ 14-21. It would be highly prejudicial to Manbro if the jury were permitted to hear Mr. Savoldelli's testimony on these and other issues without also hearing Dr. Schoar's previously-disclosed responses. Thus, having succeeded in excluding Dr. Schoar from offering this testimony during the liability phase without confirming that Mr. Savoldelli can testify, Defendants should not be permitted to have Mr. Savoldelli testify.

**2. Defendants' Position**

**Defendants' Position on Manbro's Untimely Request to Exclude Prof. Savoldelli's Liability Opinion Testimony from the Liability Phase of Trial**

As an initial matter, Manbro's request is a transparent attempt to exclude Prof. Savoldelli's liability opinions from the case in their entirety. Manbro has known for *years* that Prof. Savoldelli is providing liability testimony, whereas Dr. Schoar and Mr. Brown are both providing damages testimony. ***First***, Manbro has been on notice that Prof. Savoldelli intended to testify on (1) industry custom and practice since the outset of expert discovery in June 2021, and (2) limited damages rebuttal testimony since July 2021. ***Second***, as Manbro acknowledges, Manbro filed a number of targeted motions *in limine* aimed to limit certain of Prof. Savoldelli's liability opinions but not all of them. Dkt. Nos. 248-253. While we disagree with Manbro's above characterizations of those rulings, it cannot be denied that Manbro has never previously argued that his opinions should be excluded in their *entirety*, even though clearly related to liability issues in this case. We are therefore well beyond the point when such a last-minute ambush should be entertained at all. ***Third***, Defendants repeatedly identified Prof. Savoldelli as a trial witness during the liability phase, including on June 6, and again as recently as the parties' June 26 joint letter. ***Fourth***, with that knowledge in hand, Manbro specifically raised Dr. Schoar and Mr. Brown in its portion of the June 21 joint letter to the Court seeking to limit damages

---

[3] It also should be excluded from the damages phase. Even if a mitigation defense is available for implied covenant claims generally, Defendants' purported in-kind offers cannot form the basis of a mitigation defense, as these "offers" were, at most, offers to settle this dispute by giving up the claims that Manbro is bringing in this case in exchange for receiving an in-kind distribution. ECF No. 283 at 20-21; *see, e.g., Teradyne, Inc. v. Teledyne Indus., Inc.*, 676 F.2d 865, 870 (1st Cir. 1982) ("[T]here is no right to so-called mitigation of damages where the offer of a substitute contract is conditioned on surrender by the injured party of his claim for breach" because "[o]ne is not required to mitigate his losses by accepting an arrangement with the repudiator if that is made conditional on his surrender of his rights under the repudiated contract.") (internal quotation marks omitted).

experts to phase two—and *omitted* Prof. Savoldelli. ***Fifth***, Manbro failed to raise Prof. Savoldelli again at the final pre-trial conference. This was no mistake: Manbro abstained because it is aware that these are liability opinions. The Court's ruling that "[t]he parties are precluded from calling their *damages* experts during the liability phase of trial" remains correct and does not require clarification. Dkt. No. 346 ¶ II.E (emphasis added). Until now—with less than a week to go until trial—Manbro has never disputed that Prof. Savoldelli's affirmative opinions on hedge fund industry custom and practice go to liability.

**Prof. Savoldelli's Opinions Are Plainly Relevant to Liability Issues**. Contrary to Manbro's assertion, even a cursory review of Prof. Savoldelli's expert report makes clear that the Court's prior rulings did not exclude "most" of his opinions. Manbro's contention that Prof. Savoldelli's non-excluded opinions[4] have "no bearing on Defendants' liability" rests on mischaracterizations of those opinions and should be rejected.

- *First*, after accusing Defendants of "locking up investors' capital for almost two decades" "with no return on capital," Dkt. No. 98 ¶ 8, Manbro contends that Prof. Savoldelli's opinions regarding the transfer of the Haldia investment into WPPE, and the 20-year life of the Haldia investment are irrelevant to Manbro's claims. That is incorrect. These opinions are highly relevant to (among other things) the reasonableness of Defendants' withdrawal of Manbro from WPPE at the time that it did. As Prof. Savoldelli explains, WPPE was a "side pocket" created to hold the Haldia investment and other "typically distressed, non-performing holdings, for which no reliable or current valuation exists," and which as a result are usually "esoteric, hard to value, and hard to sell." Savoldelli Rep. ¶ 28. Accordingly, "side pockets are likely to underperform relative to other investments made in a hedge fund, and are much more likely to result in a loss or no return on investment." *Id.* ¶ 74. And Haldia "is a classic example of the type of asset typically included in a side pocket investment." *Id.* ¶ 69. These opinions are probative of what steps were feasible "to maximize long-term values for investors," Dkt. No. 317 at 2, and why Manbro received a distribution equal to the cost of the non-marketable Haldia investment. Similarly, Prof. Savoldelli's opinion that holding the Haldia investment for 20 years "in the hopes of an orderly exit" (Savoldelli Rep. ¶ 77) accorded with industry custom and practice is clearly relevant to why Defendants withdrew Manbro from WPPE "when it did," Dkt. No. 317.

- *Second*, Prof. Savoldelli's opinions regarding Defendants' "extraordinary efforts to protect TCG's and the Funds' investors' interests in" the Haldia investment, Savoldelli Rep. ¶ 84, are not propensity evidence (as Manbro misleadingly claims), but rather provides necessary context to why Defendants withdrew Manbro from WPPE when they did. As the record establishes, and Prof. Savoldelli notes, Haldia faced bankruptcy only a

---

[4] Manbro overstates the Court's rulings on certain of Manbro's Motions *in Limine*. For Manbro's Motion *in Limine* No. 3, the Court excluded "evidence and argument regarding Plaintiff's *returns* on non-Haldia investments," Dkt. No. 316 at 9 (emphasis added)—not all testimony regarding Modern Portfolio Theory (such as for background or context). For Motion *in Limine* No. 7, the Court ruled that Defendants were precluded from offering evidence of an unsigned non-disposal undertaking, but expressly permitted Defendants to rely on evidence regarding other provisions in the Rupee Loan Facility Agreement that restricted the sale of Haldia shares until 2029. *See* Dkt. No. 316 at 12.

few years before Defendants announced the final distribution, and Defendants could have written down Manbro's Haldia investment to zero at that time, but instead worked to revive Haldia. *See* Savoldelli Rep. ¶¶ 19, 84-94. Prof. Savoldelli's opinion that Defendants "exceeded Manbro's stated expectations in [their] management of the [Haldia] investment," *id.* ¶ 84, and went "beyond the industry standard for investment advisors in this context," *id.* ¶ 94, go directly to whether Defendants acted reasonably and in good faith "to maximize long-term values," Dkt. No. 317 at 2, and whether Defendants sought an improper benefit at the time they withdrew Manbro from WPPE when they could have written the Haldia investment down to zero and given Manbro nothing.

- *Third*, Manbro admits the relevance in the liability phase of Prof. Savoldelli's opinion that the final distribution payment and Defendants' offers for Manbro to remain invested in Haldia were consistent with industry custom and practice. Instead, Manbro asserts that Prof. Savoldelli did not offer an opinion that considers in isolation the final distribution "as initially announced." That artificial cut-off is unfounded for all the reasons laid out in Defendants' July 3, 2023 letter to this Court. Dkt. No. 350. The undisputed evidentiary record establishes that Manbro received the distribution payment at issue in November 2018, after Defendants both announced plans to make the final distribution and made multiple offers to Manbro to remain invested in Haldia. Prof. Savoldelli was right to consider them both. And in any event, Manbro is incorrect: separate from the offers to remain invested in Haldia, Prof. Savoldelli opines that under industry practice, a sophisticated investor like Manbro would be expected to understand the terms of a governing fund document, including that it could be withdrawn from the fund at NAV, that Defendants were "within industry practice" to compel Manbro to withdraw after 20 years, and that "it would be inconsistent with general industry practice to keep [WPPE] open indefinitely." Savoldelli Rep. ¶ 108.[5]

- *Fourth*, Manbro asserts that Defendants' offers for Manbro to remain invested in Haldia are relevant only to Defendants' mitigation defense, and by extension, damages. But that position cannot be squared with the Court's earlier conclusion that the parties' evidence regarding those offers "raises factual questions that are probative of whether Defendants acted to advantage themselves at the expense of Manbro," Dkt. No. 218 at 11—a liability issue.[6] Moreover, as a practical matter, the alleged breach at issue in this dispute does not occur (and no damages accrue) until the time of withdrawal in November 2018. This Court made clear that "the critical question is what Defendants knew or believed about the value of the Haldia shares at the time they *compelled* Plaintiff's withdrawal." Dkt. No. 316 at 6 (emphasis added). Prof. Savoldelli's opinion that "[t]here is no better

---

[5] To be clear, Manbro's footnote on this point cites from Prof. Savoldelli's deposition testimony in response to *hypotheticals* posed by Manbro's counsel. Prof. Savoldelli answered those hypotheticals under the assumption that a fund manager knew "with certainty" that (for example) "it's worth 500 and you buy it for 2." Savoldelli Dep. Tr. 69:10-11, 18. The record in this case show no such facts here.

[6] Manbro's assertion that evidence regarding Defendants' offers in-kind should also be excluded from the damages phase has already been rejected by the Court. Dkt. No. 317 at 9. Manbro's citation to *Teradyne, Inc. v. Teledyne Industries, Inc.*, 676 F.2d 865 (1st Cir. 1982)—a case involving claims under the Uniform Commercial Code as enacted under Massachusetts law, *see id.* at 866, which is inapplicable here—offers no grounds for revisiting the court's ruling.

assurance of receiving fair value of assets" than Defendants' offers for Manbro to remain invested in Haldia (Savoldelli Rep. ¶ 109) is indisputably relevant to these factual questions.

**Rebuttal Testimony Is Not Permissible on Industry Custom and Practice**. Manbro's final argument elucidates its goal. If Manbro cannot exclude Prof. Savoldelli, they seek a hook to re-inject Dr. Schoar into the liability phase of the trial under the guise of "rebuttal" as well as request additional trial time (that is likely to be significant given Manbro's prior estimates). *See* note 4 *supra*; *see also* Dkt. No. 342 at 1 (seeking 6 hours of testimony for Dr. Schoar: 4 in liability and 2 in damages). ***But Dr. Schoar, by her own admission, is not qualified to testify on industry custom and practice in the hedge fund and private equity industries.*** *See* Schoar Dep. Tr. 353:3-7 ("Do you hold—do you believe that you're an expert on the issue of industry custom and practice in the hedge fund and private equity industries? A. No."). This is further borne out by her CV, which shows no work experience in this space. The fact that Dr. Schoar has been "qualified as a valuator" does not "provide [her] with carte blanche to opine on every issue in this case." *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 311 (S.D.N.Y. 2015). On top of conceding her lack of expertise in hedge fund industry custom and practice, Dr. Schoar also concedes a glaring lack of experience. She has never "served as an investment officer of any private equity fund or hedge fund," *id.* at 350:3-6, has never worked at a hedge fund or private equity fund, *id.* at 349:13-19, has never been "qualified by any court in the United States to serve as an expert to opine on customs and practices in the hedge fund and private equity industries," *id.* at 352:12-17, and has never been "qualified by any court in the United States to serve as an expert concerning fiduciary duties of fund managers," *id.* at 351:18-22.[7] Even her expert experience outside of this case is scattershot (residential mortgage backed securities litigation and consumer fuel card litigation). *See* Schoar Rep. App'x B. Dr. Schoar should therefore remain excluded from testifying during the liability phase of trial. *See, e.g.*, *Sec. & Exch. Comm'n v. Lek Sec. Corp.*, 2019 WL 1304452, at *3 (S.D.N.Y. Mar. 21, 2019) (proffered expert was "unqualified to serve as a rebuttal witness" in securities case because he "had no experience as a professional trader, almost no formal education in statistics, and limited experience in equities and option mark").

Manbro has known for over *two years* that Prof. Savoldelli's proffered opinions on liability issues, *see, e.g.*, Savoldelli Rep. ¶¶ 14-20; it chose not to retain a qualified expert to rebut those opinions and now attempts to backdoor those opinions through an unqualified damages expert. None of that is a basis to allow an admittedly unqualified expert to opine on industry custom and practice.

* * *

[7] The Court's earlier rulings concerned only Dr. Schoar's "expert opinion . . . on the valuation of the Haldia shares," Dkt. No. 218 at 16, and held only that Dr. Schoar was "qualified to provide a valuation opinion in this case," *id.* at 17.

We thank the Court for its consideration of this request.

Respectfully,

CLEARY GOTTLIEB STEEN
& HAMILTON LLP

/s/ Mark E. McDonald
Victor L. Hou
Mark E. McDonald
Victoriya Levina
One Liberty Plaza
New York, NY 10006
Tel. (212) 225-2000
Fax (212) 225-3999

*Counsel for Manbro Energy Corporation*

KING & SPALDING LLP

/s/ Randy M. Mastro
Randy M. Mastro
Mark A. Kirsch
Shaila Rahman Diwan
Casey Kyung-Se Lee
1185 Avenue of the Americas
34th Floor
New York, NY 10036
Tel. (212) 556-2100
Fax (212) 556-2222

*Counsel for Defendants*

cc: All Counsel of Record (via ECF)